[No. H028201. Sixth Dist. Aug. 4, 2006.]

PRESERVATION ACTION COUNCIL, Plaintiff and Respondent, v.
CITY OF SAN JOSE et al., Defendants and Appellants;
LOWE'S HIW, INC., Real Party in Interest and Appellant;
INTERNATIONAL BUSINESS MACHINES, INC., Intervener and
Appellant.

## COUNSEL

Richard Doyle, City Attorney, Nora Frimann, Chief Trial Attorney, George Rios, Assistant City Attorney, and Joseph P. DiCiuccio, Deputy City Attorney, for Defendants and Appellants.

Steefel, Levitt & Weiss and Arthur J. Friedman for Real Party in Interest and Appellant.

Pillsbury Winthrop Shaw Pittman, Ronald E. Van Buskirk, Elizabeth Strahlstrom Wells and Kevin M. Fong for Intervener and Appellant.

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Plaintiff and Respondent.

Carolyn Ellen Douthat, Michael H. Buhler and Elizabeth S. Merritt for National Trust For Historic Preservation and California Preservation Foundation as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MIHARA, J.**—The questions before us in this case are whether (1) the analysis of alternatives in an Environmental Impact Report (EIR) was adequate, (2) the City of San Jose's rejection of an environmentally superior alternative was justified by a specific infeasibility finding and supported by substantial evidence, (3) the City of San Jose erred in failing to recirculate the EIR in response to an additional alternative proposed by a project opponent, and (4) the City of San Jose's responses to comments on the EIR were adequate. We conclude that the City of San Jose's analysis of a reduced-size alternative was inadequate and its rejection of this alternative was unjustified and unsupported. We therefore affirm the trial court's decision issuing a writ of mandate requiring the City of San Jose to rescind its decision certifying the EIR and approving the project.

## I. General Background

Intervener International Business Machines, Inc. (IBM), owns an 18.75-acre site on which stands Building 025, other structures, parking lots and

landscaping. Building 025 is a 69,000-square-foot building consisting of five wings connected by a narrow spine. It was built in the mid-1950's, and IBM continued to use Building 025 until the late 1990's. Since then, Building 025 has been unused. Building 025 itself is in good condition, although the exterior veneers are in critical need of maintenance.[1] Building 025 is a significant historic resource because it is "one of the finest examples of Modern industrial architecture in Santa Clara County," and it was the site of the invention of the "flying head" disk drive.

Defendant City of San Jose's objectives for development of this site are to "provide for the home improvement supply needs of the community," "expand the community's tax base by providing new sales tax revenue and/or increasing property tax revenues" and create jobs for local residents near housing.

Real party in interest Lowe's HIW, Inc. (Lowe's), sought approval from City of San Jose (the City) of a plan to demolish Building 025 and build a 162,000-square-foot building, that would include a 27,000-square-foot garden center, and parking lots on 13 acres of the site. Ancillary retail would be built in the second phase of the development on the remainder of the site.

The DEIR analyzed a group of alternatives. The primary "Project Design" alternative analyzed in the DEIR was a two-story Lowe's warehouse that would have allowed for the preservation of Building 025. This design was deemed infeasible due to functional and economic concerns. The DEIR also considered a design alternative that would have preserved Building 025 by reducing the size of the Lowe's warehouse. This alternative was also deemed infeasible.

Plaintiff Preservation Action Council (PAC) and others submitted comments on the DEIR suggesting that additional alternatives be considered with the aim of preserving Building 025. The City's responses to these comments posited that there were no additional feasible alternatives that merited analysis or consideration.

The City's planning commission voted to certify the final EIR (FEIR), and PAC appealed the certification to defendant San Jose City Council (the City Council). PAC's appeal argued that the FEIR had "overlooked" alternatives

---

[1] The draft EIR (DEIR) described the condition of Building 025 as "generally poor, and deferred maintenance is reaching a critical point for the metal, wood, and art elements." However, the DEIR was based on a "Historic Evaluation Report," which was attached to the DEIR as an appendix. This report stated: "The condition of the basic building is good; however, deferred maintenance has reached a critical point for the metal, wood and art elements." The report also noted that the deteriorated elements were primarily exterior veneers.

that would preserve Building 025 while allowing Lowe's to build a full-size warehouse and garden center. PAC's appeal was accompanied by sketches of three additional alternatives. "Alternative 2" proposed that Building 025 be preserved and "devoted to retail," while allowing for a full-size Lowe's warehouse and garden center to be built on the site.

The City Council rejected PAC's appeal, certified the FEIR and approved the project. The City Council found that "no feasible alternatives considerably different from those analyzed in the Draft EIR have been proposed that would lessen significant environmental impacts of the Project" and therefore recirculation "is not warranted." It rejected the two-story Lowe's alternative analyzed in the DEIR as not feasible.

PAC filed a writ petition challenging the City's decision to certify the FEIR and approve the project. PAC claimed that the City had violated California's Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA) by failing to "analyze a reasonable range of alternatives," failing to "adopt feasible mitigation measures and alternatives" and failing to respond to comments suggesting consideration of feasible alternatives. IBM filed a complaint in intervention.

The superior court granted PAC's petition and issued a writ of mandate. The court identified three problems with the certification of the FEIR. First, it found that there was not substantial evidence to support the rejection of the "Reduced-Scale Lowe's to Accommodate Building 025" alternative. Second, the superior court found that Alternative 2 was "substantially different from" the alternatives analyzed in the FEIR and "ostensibly feasible," and there was not substantial evidence that it was infeasible. Consequently, it "merited detailed consideration and discussion in the EIR" and recirculation. Finally, the court decided that the FEIR had not adequately responded to comments by PAC "question[ing] the limited range of alternatives examined; the restrictive and inflexible project objectives; the findings that alternatives were infeasible; and the lack of substantiating evidence regarding the conclusion that the increase in cost associated with reconfiguring the project would make the project economically infeasible."

A motion by Lowe's, IBM and the City seeking vacation of the judgment or a new trial was denied. Lowe's, IBM, the City and the City Council (appellants) filed timely notices of appeal.

## II. Discussion

### A. Additional Background

The DEIR identified "[t]he objective of the project" as "redevelop[ment of] this currently unused site with a modern big box retail establishment that will

provide for the home improvement supply needs of the community and help advance the economic development of south San Jose." The DEIR also said that, "[i]n addition, the applicant's objectives for the project . . . must be met at each Lowe's center. These requirements are especially relevant to the selection and evaluation of project alternatives . . . ." A list of a dozen Lowe's requirements followed. These requirements included:

"—Building size of at least 162,000 square-feet, which includes a 27,000 square-foot garden center.

"—Main retail sales area of the Lowe's warehouse configured as a large open rectangle with a clearance height of at least 22 feet for warehouse racking. [¶] . . . [¶]

"—At least 525 on-site parking spaces for the Lowe's center, plus parking for the ancillary retail provided at a rate of 5 spaces per 1,000 square feet of floor area.

"—Provision for truck circulation around the perimeter of the building, and sufficient maneuvering space for loading."

One chapter of the DEIR was devoted to alternatives. This chapter had five sections. The first section discussed the "no project" alternative. The second section discussed the "historic resources mitigation alternatives." The third section discussed the "tree removal and visual mitigation alternative." The fourth section discussed alternative project locations. The final section analyzed these various environmentally superior alternatives and concluded that none of them would meet Lowe's objectives for the project.

The second section, which considered alternatives that might preserve Building 025, stated at the outset that none of the alternatives would meet "the applicant's project objectives." Substantial discussion was devoted to considering whether Building 025 could be reused as a Lowe's warehouse. The unusual layout of Building 025, with five wings connected by a long spine, and Building 025's very low ceiling heights were incompatible with use as a Lowe's warehouse.[2]

---

[2] A report in an appendix to the DEIR evaluated the potential for reuse of Building 025. It found that Building 025 could not be used for the Lowe's warehouse. "A Lowe's Home Improvement Warehouse needs to have large open floor space, tall floor-to-ceiling height, and rectangular configuration, in order to function efficiently. The open stock consists of large quantities of sometimes bulky and heavy building materials, tools and products, and this inventory is delivered frequently via numerous large truck deliveries to several overhead doors at a rear loading dock. The products are stocked and distributed throughout the store with a forklift to storage units that reach as high as 22 feet, resulting in a typical building height of about 28 feet. [¶] The layout must be [a] simple rectangular shape for efficient circulation and

The analysis continued with the "Project Design Alternative." This alternative was intended to preserve both Building 025 "and its immediately surrounding landscaping," which amounted to more than 300 of the 454 trees on the site. The DEIR asserted that, "[d]ue to the space limitations," this could only be accomplished by making the Lowe's warehouse "a two-story structure" and constructing a "parking structure." Although Lowe's was unwilling to build a two-story warehouse, the primary Project Design Alternative discussed in the DEIR was a two-story warehouse and garden center with a footprint of just over 100,000 square feet and 571 surface parking spaces, including the surface parking spots adjacent to Building 025.[3] The two-story Lowe's alternative had "sufficient circulation area for customer vehicles, delivery trucks, and pedestrian movement." The DEIR concluded that the two-story Lowe's alternative was "an environmentally superior alternative to the project as proposed," but "would not meet the applicant's project objective of constructing a single-story warehouse configured as a large rectangular space for maximum efficiency." The DEIR stated that the two-story structure would be functionally difficult for customers with large items, much more expensive to construct due to the need for freight elevators and escalators and "would not be approved by Lowe's management because it would not provide an adequate return on investment for Lowe's shareholders."

The second section went on to briefly consider four "additional building configurations" that would avoid the complete demolition of Building 025. "This analysis does not develop full project alternatives but briefly considers alternative building configurations to the [two-story Lowe's alternative]."[4]

One of these configurations was an "L-shaped one-story warehouse" with parking underground beneath the warehouse. The one-paragraph discussion of this configuration concluded that the "underground parking would be physically infeasible for Lowe's which requires operations to be on one level due to the bulk and mass of materials sold."

A second configuration was a single-story "reduced-scale" Lowe's. The DEIR did not indicate exactly how much the Lowe's would be reduced. The entire one-paragraph discussion of this configuration was: "In order to meet Lowe's requirements for a single-level operation, while retaining Building

---

layout of display and storage units." Since Building 025 was nowhere near that tall and not remotely rectangular, it could not be reused for the Lowe's warehouse.

[3] The two-story alternative also provided for a parking structure with an additional 242 spaces.

[4] The "First Amendment" to the DEIR changed this sentence so that it stated that it included "a more developed alternative for full retention of Building 025 with a Reduced-Scale Lowe's."

025 in its entirety, the Lowe's center would need to be substantially reduced in size in order to provide adequate surface parking and circulation for both uses. The Lowe's development program includes a standardized building type with approximately 162,000 square feet of floor area. The project applicant has indicated that Lowe's cannot significantly scale down its program requirements without placing it at a competitive disadvantage in the marketplace. In addition, while a reduced-scale Lowe's might avoid direct impacts to the historic resource, adverse effects upon the historic setting could occur. Therefore, this configuration would likely not entirely avoid the significant impact to the historic resource, nor would it meet the applicant's project objective of constructing a 162,000 square-foot warehouse on this site."[5]

A third configuration involved placing parking for Building 025 beneath Building 025. This configuration was rejected because Building 025's basement mechanical spaces would interfere and Building 025's parking needs were already met. A fourth configuration contemplated the partial demolition of Building 025 and concluded that what would be left would not be worth saving. The second section also separately considered a variety of alternative uses for Building 025 and concluded that it could be used for "office/research and development" or possibly a private school.

The third section of the DEIR's alternatives chapter concluded that retention of 74 more trees would require the removal of 71 parking spaces, which would not meet Lowe's parking objectives and would interfere with a Lowe's "project objective of high visibility." The fourth section found that the only alternative location for the project was "poorly situated to serve the targeted trade area" and therefore would not "meet the applicant's objectives for the project."

The final section concluded that the Project Design Alternative was the most environmentally superior alternative other than the no project alternative, but "this alternative would not meet the applicant's objectives for the project." The full explanation for this conclusion reads: "From a functional standpoint, the two-story alternative would not meet Lowe's standards for an efficient and convenient store configuration. The project applicant desires the layout of the store to be on a single level, simple and rectangular in shape for efficient circulation and layout of display and storage units. Due to the bulk and mass of materials sold, the two-story alternative could make carrying items between floors cumbersome and inconvenient. In addition, the necessity of parking in a structure would add further difficulty and inconvenience to carrying large items. Since there are home improvement warehouses in the

---

[5] As we note *ante*, this analysis was substantially expanded by the First Amendment to the DEIR.

local area which do not present these difficulties, customers could choose the more convenient alternative, placing Lowe's at a competitive disadvantage in the marketplace."

In an October 15, 2003 letter to the planning director (which appears in the administrative record but was not incorporated into the DEIR or the FEIR), James Manion, the Lowe's site development manager for this project, responded to a comment asking why Lowe's could not build a smaller store in San Jose. His two-paragraph response dismissed the notion of a reduced-size Lowe's as infeasible.

"First, there is some confusion as to the actual total square feet in the formats discussed in Lowe's 2003 Annual Report (Report). The Report designates store types by their sales floor square footage only. The 116,000 square foot store is actually 162,000 square feet and the 94,000-square foot store is actually 137,000 square feet. Therefore, it would be incorrect to presume that the 94,000 square foot store is only 94,000 square feet when in reality it is 137,000 square feet. [¶] The size of the store Lowe's constructs is determined by many factors such as market size, consumer demand and merchandise mix. As stated above, there are two prototypes: 1) The 162K for large markets; and 2) The 137K, primarily used for smaller markets. The 162K prototype is the only appropriate size store that will allow Lowe's to meet the San Jose market demands of product selection/variety and stock the appropriate amount of inventory. Even if Lowe's could use the 137,000 square feet, it still would require the construction of a two-story building and parking structure to accommodate IBM Building 025. Because the 162,000 square foot store is appropriate for the San Jose market, Lowe's would not build the smaller store as it would not meet the San Jose market demand."

An October 2003 amendment to the DEIR revised and substantially expanded the DEIR's discussion of the reduced-size Lowe's configuration.[6] This configuration was now referred to as "a more developed alternative for full retention of Building 025 with a Reduced-Scale Lowe's." The reduced-size Lowe's configuration was now considered as a 94,000 square-foot Lowe's, including the garden center, with Building 025 housing the future retail development.[7] The Lowe's would be configured as a single-story rectangular structure, and adequate surface parking would be provided for

[6] The discussion of the two-story alternative was also altered to note that "there are seven home improvement warehouses with single-story layouts in the local area . . . ." This revision was offered as support for Lowe's claim that a two-story structure would put Lowe's at a competitive disadvantage.

[7] It is unclear whether the 94,000-square foot figure referred to the total size of the store or only to the size of the "sales floor." Manion's letter to the planning director regarding the precise size of Lowe's "small market" store occurred around the time of this amendment. Since this amendment referred to other data contained in Manion's letter to the planning

both developments. The analysis concluded that this configuration would meet all of the Lowe's project objectives other than the square footage of the structure.

Nevertheless, the reduced-size configuration was deemed infeasible because "[t]he project applicant has indicated that Lowe's cannot significantly scale down its program requirements to allow a 94,000 square foot store suitable for a small market population under 100,000 without placing it at a competitive disadvantage in the marketplace. The small market store would place the applicant at a competitive disadvantage because it would be unable to meet the demands and requirements of a large market store in terms of throughput and merchandise availability." "[I]t would not meet the applicant's project objective of constructing a 162,000 square-foot warehouse on this site to compete in a large market such as San Jose."

A second amendment to the DEIR added an October 21, 2003 letter from Manion to the planning commission as an appendix to the DEIR. Manion stated in this letter that Lowe's had 910 stores in 45 states. All of the stores were single-story. Manion did not provide any information about the sizes of those stores. He said only that Lowe's believed that it obtained a competitive advantage by having "wider, brighter aisles, better home project layout between departments, and better merchandise organization with customer design support." These features "give our stores less of an industrial warehouse atmosphere and make for a better, family-friendly shopping experience."

Manion maintained that Lowe's was wedded to its project as proposed. "[D]evelopment of a Lowe's store layout requires years of research and planning as it relates to the structure, the logistics of moving merchandise, and effective operational plans. The store that Lowe's proposes for this San Jose location is the cumulative result of 57 years of customer input, merchandise planning, and significant market research." Manion did not address the reduced-size Lowe's alternative in this letter. Manion asserted that a two-story or L-shaped structure "would prove operationally and functionally infeasible for Lowe's in that the structure would deviate from Lowe's historical prototype, resulting in reduced convenience and loss of consumer expectation."

The staff report for the planning commission hearing stated that "Lowe's has indicated [a two-story store] would be infeasible in that it would cost twice as much to construct, result in a highly inefficient operation and lower

director, it would be reasonable to conclude that the 94,000-square-foot store analyzed in the amended DEIR was actually the 137,000-square-foot store that Manion identified in this letter as Lowe's "small market" store.

customer satisfaction levels . . . ." It also explained Lowe's opposition to the other configurations discussed in the EIR. "Lowe's has indicated that L-shaped design with underground parking would be physically infeasible in that Lowe's requires operations to be on one level due to the bulk and mass of materials sold. In regard to the reduced scale alternative, Lowe's has clarified that the 94,000 square-feet [sic] represents the sales floor of the store and that the garden center for this prototype requires additional site area. Furthermore, Lowe's has indicated that their smaller format store is intended for a market population of less than 100,000 and that a small market store in this larger market would be infeasible in that it would put the company at a competitive disadvantage in terms of its ability to keep the store stocked with a full range of merchandise."

After the planning commission certified the FEIR, PAC appealed the certification of the FEIR to the City Council. PAC submitted sketches of three additional alternative configurations that would preserve Building 025. Alternative 2 proposed that Building 025 be preserved and "devoted to retail," while still allowing for a full-size Lowe's warehouse and garden center to be built on the site. The Lowe's warehouse in Alternative 2 was not entirely rectangular; it had a very short L at one end. PAC's appeal argued that the DEIR and FEIR had "overlooked" this alternative.[8]

The planning director's memorandum to the City Council regarding PAC's appeal asserted that PAC's alternatives "are not substantially different from the alternatives analyzed in the Final EIR" and therefore did not require further analysis. The memorandum also concluded that PAC's alternatives were not "significant new information" and thus did not merit recirculation of the EIR.

The City Council certified the FEIR, approved the project and made findings. The City Council found that "the Project will result in significant impacts to historic resources . . . [which are] **significant and unavoidable,**" but "no feasible alternatives considerably different from those analyzed in the Draft EIR have been proposed that would lessen significant environmental impacts of the Project." The only design alternative addressed in the City Council's findings was the two-story Lowe's alternative that was analyzed in the DEIR as the primary design alternative. The City Council found that the two-story alternative was not feasible because it lacked "operational feasibility" and would be more costly to construct and operate. Finally, the City Council concluded that the economic benefits of the project outweighed the significant environmental impacts that it would cause.

---

[8] IBM conceded that PAC's Alternative 2 had not been suggested "too late" to be considered. It claimed only that this alternative was not significantly different from those analyzed in the EIR.

The superior court found that (1) the City's rejection of the reduced-size Lowe's alternative was not supported by substantial evidence, (2) PAC's proposed Alternative 2 was "substantially different from" the alternatives analyzed in the FEIR and "ostensibly feasible," and therefore it should have been analyzed in the EIR, and (3) the City had failed to adequately respond to comments by PAC regarding the alternatives.

## B. EIR's and Judicial Review

"We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' . . . We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements. [¶] . . . [¶]

[■] "The core of an EIR is the mitigation and alternatives sections. The Legislature has declared it the policy of the State to 'consider alternatives to proposed actions affecting the environment.' . . . [¶] In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' '[I]t is the policy of the state that public agencies should not approve projects as proposed if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen the significant environmental effects of such projects . . . . [I]n the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564–565 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta II*), citations omitted.)

"CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [A]n EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project*, which: (1) offer substantial environmental advantages over the project proposal (Pub. Resources Code, § 21002); and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved." (*Goleta II, supra*, 52 Cal.3d at p. 566.) The

EIR "is required to make an in-depth discussion of those alternatives identified as at least potentially feasible." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1504, fn. 5 [19 Cal.Rptr.3d 1].)

■ "In general, an EIR should set forth the alternatives that were considered by the lead agency and rejected as infeasible during the scoping process, and the reasons underlying the agency's determination. [Citation.] However, the administrative record may be studied 'to assess the degree of discussion any particular alternative deserves, based on the alternative's feasibility and the stage in the decisionmaking process it is brought to the attention of the agency.' [Citation.] To be sure, agency consideration of otherwise reasonable alternatives in the administrative record cannot replace the CEQA mandated discussion of alternatives in the EIR. [Citations.] 'But where potential alternatives are not discussed in detail in the [EIR] because they are not feasible, the evidence of infeasibility need not be found within the [EIR] itself. Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [EIR].' " (*Goleta II, supra,* 52 Cal.3d at p. 569.) The "failure to raise the specific alternatives during the comment period would not necessarily have warranted a decision to exclude the [alternatives] altogether from consideration, particularly if they had appeared to represent reasonable project alternatives." (*Id.* at p. 568.)

■ "An EIR's discussion of alternatives must contain analysis sufficient to allow informed decision making. [Citation.] [¶] . . . [¶] . . . Without meaningful analysis of alternatives in the EIR, neither the courts nor the public can fulfill their proper roles in the CEQA process. . . . 'To facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions.' [Citations.] An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 404–405 [253 Cal.Rptr. 426, 764 P.2d 278].)

"It is the [agency]'s responsibility to provide an adequate discussion of alternatives. (Guidelines, § 15126, subd. (d).) That responsibility is not dependent in the first instance on a showing by the public that there are feasible alternatives. If the [agency] concludes there are no feasible alternatives, it must explain in meaningful detail in the EIR the basis for that conclusion." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 405.)

"Since CEQA charges the agency, not the applicant, with the task of determining whether alternatives are feasible, the circumstances that led the

applicant in the planning stage to select the project for which approval is sought and to reject alternatives cannot be determinative of their feasibility. The lead agency must *independently* participate, review, analyze and discuss the alternatives in good faith." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 736 [270 Cal.Rptr. 650].) "The fact that an alternative may be more expensive or less profitable is not sufficient to show that the alternative is financially infeasible. What is required is evidence that the additional costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project." (*Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1181 [243 Cal.Rptr. 339] (*Goleta I*).)

Judicial review of an agency's decision to certify an EIR and approve a project "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; see *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 392, fn. 5.) Thus, we consider only whether the City failed to comply with CEQA or made determinations that were not supported by substantial evidence.[9]

## C. Reduced-size Alternative

It is undisputed that, by destroying Building 025, the approved project would have a significant environmental impact. (Pub. Resources Code,

---

[9] The CEQA Guidelines, California Code of Regulations, title 14, section 15000 et seq., contain a definition of " 'substantial evidence' *as used in these guidelines*" in connection with whether a project will have a significant effect on the environment. (Cal. Code Regs., tit. 14, § 15384, italics added.) "(a) 'Substantial evidence' as used in these guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence. [¶] (b) Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384.)

The Guidelines do not set forth the standard of review that applies to judicial review of an agency's certification of an EIR and approval of a project. That standard is set forth in Public Resources Code section 21168.5. Nevertheless, cases have repeatedly incorporated the Guidelines definition of "substantial evidence" into their statement of the standard of review applicable to certification and approval decisions. (See *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 393 [quoting Guidelines definition in stating general standard of review].)

§ 21084.1 [adverse impact on historical resource is significant effect on environment].) Thus, the City had two duties.

First, in order for the FEIR to be certified as in compliance with CEQA, the FEIR was required to identify a reasonable range of environmentally superior alternatives and to set forth facts and "meaningful analysis" of these alternatives rather than " 'just the agency's bare conclusions or opinions.' " (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d 376, 404–405; see *Goleta II*, *supra*, 52 Cal.3d at p. 569; Cal. Code Regs., tit. 14, § 15126.6, subd. (a) (Guidelines).)[10] In addition, the EIR should have identified any alternatives rejected as infeasible during the scoping process along with the reasons why those alternatives were found infeasible. (*Goleta II*, *supra*, 52 Cal.3d at p. 569.) The EIR was required to contain "detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully" the alternatives to the proposed project. (*Laurel Heights*, at pp. 404–405.)

Second, in order to approve a project that would have a significant environmental impact, the City was required to *make findings* identifying (1) the "[s]pecific . . . considerations" that "make infeasible" the environmentally superior alternatives and (2) the "specific . . . benefits of the project [which] outweigh" the environmental harm. (See Pub. Resources Code, §§ 21002.1, subd. (b), 21081; Guidelines, § 15092, subd. (b).)

We turn first to the adequacy of the FEIR. Appellants challenge the trial court's finding that the FEIR's discussion of the reduced-size Lowe's alternative was inadequate to meet the requirements of CEQA. They assert that the FEIR considered a reasonable range of alternatives and properly concluded that these alternatives were infeasible. PAC contends that the FEIR failed to consider a reasonable range of alternatives and did not include enough facts and analysis to support a conclusion that the reduced-size Lowe's alternative was infeasible.

█ The CEQA Guidelines provide a framework for an EIR's alternatives discussion.[11] "An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain *most of the basic objectives of the project* but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of

---

[10] Subsequent references to Guidelines will be to California Code of Regulations, title 14.

[11] "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d 376, 391, fn. 2.)

the alternatives. An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of *potentially feasible* alternatives that will foster informed decisionmaking and public participation. An EIR is not required to consider alternatives which are infeasible. The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives. There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Guidelines, § 15126.6, subd. (a), italics added.)

A potential alternative should not be excluded from consideration merely because it "would impede to some degree the attainment of the project objectives, or would be more costly." (Guidelines, § 15126.6, subd. (b).) "The range of potential alternatives to the proposed project shall include those that could feasibly accomplish *most of the basic objectives* of the project and could avoid or substantially lessen one or more of the significant effects. The EIR should briefly describe the rationale for selecting the alternatives to be discussed. The EIR should also identify any alternatives that were considered by the lead agency but were rejected as infeasible during the scoping process and briefly explain the reasons underlying the lead agency's determination. Additional information explaining the choice of alternatives may be included in the administrative record. Among the factors that may be used to eliminate alternatives from detailed consideration in an EIR are: (i) failure to meet most of the basic project objectives, (ii) infeasibility, or (iii) inability to avoid significant environmental impacts." (Guidelines, § 15126.6, subd. (c), italics and boldface added.)

■ "The EIR shall include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project." (Guidelines, § 15126.6, subd. (d).) "The range of alternatives required in an EIR is governed by a 'rule of reason' that requires the EIR to set forth only those alternatives necessary to permit a reasoned choice. . . . [T]he EIR need examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project. The range of feasible alternatives shall be selected and discussed in a manner to foster meaningful public participation and informed decision making." (Guidelines, § 15126.6, subd. (f).) "[E]conomic viability" is one of the factors that may be taken into account in addressing the feasibility of an alternative. (Guidelines, § 15126.6, subd. (f)(1).) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.)

The FEIR does analyze a range of alternatives to the proposed project including a reduced-size alternative, which it identifies as a 94,000-square-foot, single-story, rectangular Lowe's, including the garden center, with Building 025 housing the future retail development. The FEIR's analysis of the reduced-size alternative concludes that this configuration would meet all of Lowe's project objectives other than the square footage of the structure. The sole basis mentioned in the FEIR to support the proposition that the reduced-size alternative was infeasible was Lowe's belief that a smaller store would place it at a "competitive disadvantage" in a "large market such as San Jose" due to its inability "to meet the demands and requirements of a large market store in terms of throughput and merchandise availability."

The FEIR's analysis of the reduced-size alternative does not initially appear to be inadequate. The parameters of this alternative are stated, and the FEIR notes that the reduced-size alternative is environmentally superior and would meet all of the project objectives other than the square footage. However, the FEIR's analysis of this alternative is unclear as to whether the 94,000-square-foot figure refers to the size of the entire store or only to the sales floor, which makes it impossible to determine whether this alternative was actually consistent with Lowe's "small market" prototype. This ambiguity also would have made it difficult to compare the size of the reduced-size alternative to the size of other home improvement warehouses in the area in order to evaluate the validity of the claim by Lowe's that the reduced-size alternative was infeasible because it would produce a "competitive disadvantage." Of course, no such comparison could be made because neither the FEIR nor the administrative record contains any data about the size of other home improvement warehouses in the area with which this Lowe's would compete.

This ambiguity in the FEIR's analysis of the reduced-size alternative meant that the public and the City Council were not properly informed of the requisite facts that would permit them to evaluate the feasibility of this alternative. The FEIR was inadequate because it lacked "detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully" the reduced-size alternative. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 404–405.)

Even if the FEIR had not contained this ambiguity, the City's action would still violate CEQA in two other respects. The City Council failed to make a

specific finding regarding the infeasibility of the reduced-size alternative, and the administrative record does not contain substantial evidence to support such a finding. The City Council's only specific findings regarding alternatives were directed at the two-story alternative and were inapplicable to the reduced-size alternative. Unlike the two-story alternative, there was no evidence that the reduced-size alternative would be more expensive to build and stock or that the reduced-size alternative would be operationally infeasible. Lowe's claimed that a reduced-size store would put it at a competitive disadvantage "in terms of throughput and merchandise availability." The FEIR provides no independent facts or analysis to support that claim. While it was not necessary for the evidentiary basis for this claim to be contained in the FEIR itself, it was necessary for such a basis to exist in the administrative record.

Lowe's claims that the infeasibility of the reduced-size alternative was established by Manion's first letter, which appears in the administrative record but was not incorporated into the DEIR or the FEIR. In this letter, Manion asserted that (a) Lowe's had only "two prototypes: 1) The 162K for large markets; and 2) The 137K, primarily used for smaller markets," (b) "The 162K prototype is the only appropriate size store that will allow Lowe's to meet the San Jose market demands of product selection/variety and stock the appropriate amount of inventory," (c) the smaller store "still would require the construction of a two-story building and parking structure to accommodate IBM Building 025," and (d) "Lowe's would not build the smaller store as it would not meet the San Jose market demand."

While this letter certainly clarifies Lowe's position with regard to the size of its store, it raises more questions than it resolves. Since it is unclear whether the amended DEIR's analysis of the reduced-size Lowe's was based on the 94,000-square-foot figure or the 137,000-square-foot figure, either the DEIR conflicts with the claim by Lowe's regarding the need for a two-story warehouse and a parking structure or the DEIR completely failed to analyze whether a 137,000-square-foot single-story structure could coexist with Building 025 on the site. The DEIR does not reflect that a reduced-size, single-story Lowe's and Building 025 cannot coexist on the site, and Lowe's bald claim to the contrary cannot substitute for analysis in the FEIR of this potentially feasible alternative.

In any case, the City Council made no infeasibility finding as to the reduced-size alternative and the absent finding is not supported by substantial evidence. The City Council's findings regarding design alternatives were

limited to the two-story alternative and alternatives that were not addressed in the FEIR. The administrative record contains no facts, independent analysis or "meaningful detail" to support Lowe's claim that "San Jose market demands of product selection/variety" and the need to "stock the appropriate amount of inventory" rendered a reduced-size store (whether it was 94,000 square feet or 137,000 square feet) infeasible. Lowe's reasons for proposing a large store and rejecting a smaller store "cannot be determinative of [the smaller store's] feasibility." (*Kings County Farm Bureau v. City of Hanford*, *supra*, 221 Cal.App.3d 692, 736.) The City was obligated to "independently participate, review, analyze and discuss the alternatives in good faith." (*Ibid.*) And the EIR, or some other document in the administrative record, should have "explain[ed] in meaningful detail . . . the basis for" the alleged infeasibility of the reduced-size alternative. (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d 376, 405.)

■ Neither the FEIR nor the administrative record contains any meaningful detail or independent analysis of the validity of Lowe's claim that the reduced-size alternative is infeasible, and the City Council made no specific finding validating that claim. On this record, the trial court correctly held that the City's rejection of the reduced-size Lowe's alternative cannot be upheld.

IBM claims that the City could have found the reduced-size alternative to be infeasible because it would be less profitable and therefore produce fewer tax dollars. The mere fact that an alternative might be less profitable does not itself render the alternative infeasible unless there is also evidence that the reduced profitability is "sufficiently severe as to render it impractical to proceed with the project." (*Goleta I*, *supra*, 197 Cal.App.3d 1167, 1181.) The administrative record does not contain any evidence that the reduced-size alternative would be so much less profitable and produce so many fewer tax dollars that the project would be impractical.

The City violated CEQA by failing to ensure that the FEIR adequately analyzed the potentially feasible and environmentally superior reduced-size alternative and failing to make a specific finding, based on substantial evidence, regarding the feasibility of the reduced-size alternative.

■ The revision of the amended DEIR to remedy its inadequate analysis of the reduced-size alternative will necessarily require recirculation of this section of the amended DEIR. "If, subsequent to the period of public and interagency review, the lead agency adds 'significant new information' to an

EIR, the agency must issue new notice and must 'recirculate' the revised EIR, or portions thereof, for additional commentary and consultation. [Citations.] The revised environmental document must be subjected to the same ' "critical evaluation that occurs in the draft stage," ' so that the public is not denied an ' " 'opportunity to test, assess, and evaluate the data and make an informed judgment as to the validity of the conclusions to be drawn therefrom.' " ' " (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 131 [104 Cal.Rptr.2d 326]; see Guidelines, § 15088.5.) Here, the public should have had the opportunity to assess and comment upon an adequate analysis of the reduced-size alternative.

The City's CEQA violations can only be remedied by revising the amended DEIR to include an adequate analysis of the reduced-size alternative, recirculating the revised portion of the amended DEIR and adding to the administrative record evidence that will permit the City Council to make an informed, fact-based decision on the feasibility of the reduced-size alternative. The trial court's writ commanding the City to rescind its certification and approval and to comply with CEQA will accomplish this goal, and therefore the trial court's writ is the appropriate remedy.

### D. PAC's Alternative 2

The trial court also held that the City violated CEQA by failing to analyze PAC's proposed Alternative 2 because this alternative was "substantially different from" the alternatives analyzed in the FEIR and "ostensibly feasible." The record does not support the trial court's conclusion in this regard.

"[R]ecirculation is only required when the information added to the EIR changes the EIR in a way that deprives the public of a meaningful opportunity to comment upon . . . a feasible project alternative. . . . [A] decision not to recirculate an EIR must be supported by substantial evidence." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1120 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

The DEIR analyzed a range of alternatives that included at least two alternatives that attempted to place a full-size Lowe's on the site without demolishing Building 025. The two-story alternative was analyzed because, according to the DEIR, a single-story 162,000-square-foot Lowe's with adequate parking could not be accommodated on the site without demolishing Building 025. The L-shaped Lowe's alternative was another attempt to

accommodate both a full-size Lowe's and Building 025. Analysis of these two alternatives supported the conclusion that a full-size, single-story Lowe's with adequate parking could not be accommodated on the site without demolition of Building 025.

Lowe's asserted below that Alternative 2 would not meet its "functional needs" because Lowe's required a "rectangular-shaped structure" and could not utilize the L-shaped configuration represented in Alternative 2. Lowe's also asserted that Alternative 2 would "result in 300 fewer warehouse and garden center parking spaces."

PAC's Alternative 2 was an attempt to fashion an additional alternative that would allow for a full-size Lowe's without the demolition of Building 025. However, the simple sketch provided by PAC of this proposed alternative did not propose a potentially feasible alternative that was substantially different from those analyzed in the DEIR. In light of the analysis in the DEIR of the other full-size Lowe's alternatives, Alternative 2 clearly could not have included adequate parking for both the Lowe's and the retail use of Building 025. In addition, the placement of the Lowe's closely adjacent to Building 025 in Alternative 2 would have seriously limited vehicular circulation around the Lowe's, which obviously raised significant functional concerns. Although the City may wish to add further analysis to the DEIR regarding Alternative 2 when it recirculates the DEIR with additional analysis of the reduced-size alternative, the City's failure to recirculate the DEIR upon receipt of PAC's Alternative 2 did not violate CEQA. The City had already analyzed a range of alternatives directed at the same goal and Alternative 2 did not appear to be substantially different or potentially feasible.

### E. Responses to Comments

### 1. Background

The FEIR contained comments on the DEIR and responses to the comments. The San Jose Commission on Historic Landmarks commented that there was "a need for an alternative that better addresses both Lowe's interests and retention of Building # 25 . . . ." The commission asked that the City and Lowe's "pursue an improved version of the Project Design Alternative." The FEIR responded: "The Commission did not recommend a new, specific alternative or a refinement of an alternative in the EIR. Therefore, the City need not speculate what 'another alternative' would be that better addresses the objectives of both the applicant and preservation." "[T]he range of alternatives in the EIR is adequate."

The National Trust for Historic Preservation (the Trust) commented: "Given Lowe's diverse portfolio of store prototypes, the project objectives in the DEIR appear unnecessarily restrictive and inflexible. . . . Despite these seemingly rigid criteria, Lowe's has introduced a range of store prototypes in different sizes. In June 2003, Lowe's announced that '20 to 25 of 130 stores on the drawing board for 2003 will be new 94,000-square-foot prototypes,' which is 'the size of the basic Home Depot store.' " "The project objectives should be redefined to allow consideration of alternative store layouts used by Lowe's and other home improvement retailers, including reduced-scale and two-story prototypes." The City responded: "Lowe's has stated that the 94,000 square foot store is for a small market such as Visalia, California with a population of approximately 100,000. They have also stated that a 116,000 square foot store with a 25,000 square-foot garden center is necessary for a large market such as San Jose." "The comment recommending the project objectives should be redefined to allow consideration of alternative store layouts used by Lowe's and other home improvement retailers will not be addressed in the Final EIR because such changes would be inconsistent with the project description proposed by the applicant."

PAC commented that the DEIR had not considered using Building 025 for the future retail development and suggested that such an alternative be considered. The City's response said nothing about this alternative. PAC also inquired why the DEIR had not considered "that Lowe's has other standard store sizes" such that the warehouse could be scaled down to accommodate Building 025. The City's response simply referred back to its response to the Trust's comment. Other comments by PAC suggesting the consideration of additional alternatives received similarly nonsubstantive responses.

## 2. Analysis

Some of the City's responses to comments regarding alternatives appear inadequate. Lowe's concedes that the sufficiency of the responses depends on the adequacy of the amended DEIR's analysis of the design alternatives. Since we have found the amended DEIR's analysis inadequate and the City will now be required to recirculate a revised version of its alternatives analysis and respond to comments on that analysis, we are confident that the City will provide adequate information that is responsive to these comments either in the amended DEIR or in its responses to comments received on the amended DEIR. Our affirmance of the trial court's judgment will assure that the City complies with CEQA's requirements.

## III. Disposition

The trial court's judgment is affirmed.[12]

Rushing, P. J., and Elia, J., concurred.

---

[12] The trial court found the City's action deficient in three respects: (1) its analysis and rejection of the reduced-size alternative, (2) its failure to analyze Alternative 2 and (3) the City's responses to comments. Although we disagree with the trial court with regard to Alternative 2, the appropriate disposition is still affirmance of the trial court's judgment. That is so because the dispositional provisions (as opposed to the findings) in the trial court's judgment and writ simply required the City to void its certification of the FEIR and approval of the project "and to refrain from further approvals of the project unless and until the City certifies a revised EIR and makes findings in compliance with CEQA." This disposition is the correct remedy for the City's CEQA violations in connection with the reduced-size alternative and its responses to comments.