[No. H035818. Sixth Dist. Jan. 4, 2012.]

THE FLANDERS FOUNDATION, Plaintiff and Appellant, v.
CITY OF CARMEL-BY-THE-SEA et al., Defendants and Appellants.

604

## COUNSEL

Brandt-Hawley Law Group and Susan Brandt-Hawley for Plaintiff and Appellant.

Kennedy, Archer & Harray, Richard Harray, Jon R. Giffen and David W. Balch for Defendants and Appellants.

## OPINION

**MIHARA, Acting P. J.**—Appellant[1] City of Carmel-by-the-Sea (the City) appeals from the trial court's judgment granting a mandate petition filed by respondent The Flanders Foundation (the Foundation). The Foundation successfully challenged the City's certification of a final environmental impact report (FEIR) for, and its approval of, a project to sell a City-owned property known as the Flanders Mansion property (the Mansion property), which consists of a large residence on a parcel of land surrounded on all sides by a City-owned park.

The City challenges the trial court's findings that (1) the FEIR did not adequately consider the potential environmental impacts associated with the application of the Surplus Land Act (Gov. Code, § 54220 et seq.) to the City's sale of the Mansion property, and (2) the FEIR did not adequately respond to a comment suggesting the alternative of selling the structure with a smaller parcel of land. The City contends that the impact of the Surplus Land Act was too speculative to raise any reasonably foreseeable potential environmental impact and maintains that the FEIR adequately responded to the comment suggesting a reduction in the size of the parcel.

In its cross-appeal, the Foundation contests the trial court's failure to uphold its challenge on the additional grounds that (1) the economic analysis that underlay the City's conclusion that certain alternatives were infeasible was required to be in the EIR (environmental impact report) itself, (2) the economic analysis in the administrative record was inadequate, (3) the City inaccurately concluded that the alternatives were infeasible, and (4) the City's statement of overriding considerations was inadequate.

We conclude that the trial court erred in concluding that the FEIR failed to adequately address the Surplus Land Act issue. However, in all other respects, we reject the contentions of both the City and the Foundation. Accordingly, we modify and affirm the judgment.

## I. Background

The Mansion property is located within, and surrounded on all sides by, the City's 35-acre Mission Trails Nature Preserve (the Preserve). The City purchased the Preserve and the Mansion properties in 1971 and 1972. The Preserve is an environmentally sensitive habitat area (ESHA). Situated on the Mansion property is a "two-story Tudor Revival English Cottage" designed

---

[1] The City Council of the City of Carmel-by-the-Sea is also an appellant, but we will refer to both appellants interchangeably as the City.

by noted architect Henry Higby Gutterson and built in 1924. This 6,000-square-foot, two-story, six-bedroom, four-and-a-half-bath residence is considered "a remarkable example" of Gutterson's work and is listed on the National Register of Historic Places. The residence has been used over the years as a private residence, an art institute, and office space, but it has been vacant since 2003. By means of a lot line adjustment, the residence is currently situated on a 1.252-acre parcel zoned P-2 (improved parkland). The Preserve is zoned P-1 (unimproved parkland).

The proposed project is "the sale of the Flanders Mansion property, a 1.252 acre parcel together with all improvements." The City's "primary purpose" for the project is to "divest the City of the Flanders Mansion Property[,] which is in need of significant short-term and long-term repair and rehabilitation." The "secondary objectives" of the project are to (1) preserve the Mansion as a historic resource; (2) put the Mansion property "to productive use"; (3) "ensure that future use" of the Mansion property "will not cause significant traffic, parking or noise impacts on the surrounding neighborhood"; (4) ensure that future use of the Mansion property will not "significantly disrupt the public's enjoyment" of the Preserve; (5) "ensure that environmental resources of the park are protected"; and (6) "ensure that the Flanders Mansion parcel continues to provide the public with as many park benefits as are practical."

After a previous EIR for this project was decertified by court order, the City prepared and circulated a new draft EIR (DEIR) in January 2009.[2] The DEIR identified as a significant and unavoidable environmental impact of the project the permanent "loss [of] locally significant parkland that is considered an integral component of [the Preserve]." The DEIR concluded that there was no way to mitigate this environmental impact.

The DEIR analyzed four project alternatives: (1) the no project alternative; (2) a lease for single-family residential use (residential lease alternative); (3) a lease for public/quasi-public use (public lease alternative); and (4) a sale with conservation easements and mitigations (sale plus alternative). All of these alternatives were found to have fewer environmental impacts than the proposed project. However, the DEIR took the position that only the sale plus alternative would satisfy the primary objective of the project, "divestment." Each of the remaining alternatives would satisfy some of the secondary objectives of the project.

---

[2] In 2005, the City certified an FEIR (2005 FEIR) for this project. The Foundation successfully challenged the 2005 FEIR, and the City was ordered to rescind its certification of the 2005 FEIR and approval of the project. The City thereafter prepared and recirculated a revised DEIR, and thereafter certified the FEIR that was challenged in the superior court proceedings that are under review in this appeal and cross-appeal.

In its discussion of the alternatives, the DEIR stated that the City "is in the process of preparing an economic feasibility analysis that evaluates the feasibility of potential project alternatives vis-à-vis the relevant project alternatives and various economic considerations. Findings of feasibility will ultimately be up to the discretion of the City . . . as part of the project approval process . . . ." "[T]he City has engaged consultants to prepare an economic analysis evaluating the financial feasibility of the various project alternatives. This analysis will be used by the City in their deliberations during the project consideration."

The DEIR designated both lease alternatives and the sale plus alternative as environmentally superior alternatives. The lease alternatives were superior because the City would retain ownership of the property and "preserve flexibility on how the property is used in the future . . . ." If those alternatives were found infeasible, the DEIR concluded that the sale plus alternative would be the environmentally superior alternative.

In March 2009, the City obtained an "economic feasibility analysis" from CBRE. In April 2009, the City circulated the FEIR, which included the City's responses to comments on the DEIR.[3] One of those comments raised issues about the economic feasibility analysis, the Surplus Land Act, and the alternative of selling the residence with a smaller lot. The FEIR responded to this comment by noting that the economic feasibility analysis had been prepared and was available for public review and adding language to the DEIR regarding the Surplus Land Act issue. The FEIR did not provide any response regarding the alternative of selling the residence with a smaller lot.

In May 2009, the City adopted five resolutions. One was a resolution certifying that the FEIR was adequate and complete and complied with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). The City found that the project would have the significant and unavoidable impact of the permanent loss of City ownership of public parkland. A second resolution (1) adopted a mitigation monitoring and reporting program (MMRP), (2) created a requirement that the conditions of sale would "incorporate and impose" the MMRP requirements, and (3) required preparation of conditions, covenants, and restrictions (CC&R's), which would be recorded on the Mansion property and would "run with the land," that imposed the MMRP requirements on any future owners of the property. A third resolution found the lease and no project alternatives to be infeasible and adopted a statement of overriding considerations. A fourth

---

[3] An FEIR consists of the DEIR, comments, and responses to those comments. (Cal. Code Regs., tit. 14, §§ 15000 et seq. (hereafter CEQA (California Environmental Quality Act; Pub. Resources Code, § 21000 et seq.) Guidelines), 15132.)

resolution adopted as the project the sale plus alternative. The fifth resolution proposed the discontinuance of the use of the Mansion property as a public park.

## II. Superior Court Proceedings

The Foundation challenged the City's actions by seeking a writ of mandate in the superior court. The court issued an extensive "Intended Decision" that "resolves factual and legal disputes, and shall suffice as a statement of decision as to all matters contained herein." The Intended Decision stated: "The Court finds that the City did not comply with CEQA as a matter of law because the City failed to analyze the potential environmental impacts of selling or leasing the Mansion in compliance with the Surplus Lands Act, and in responding to comments. In all other respects, the Court finds that the City complied with CEQA." The court's Intended Decision explicitly rejected the Foundation's challenge to the economic feasibility analysis and found that this analysis was adequate and did not have to be included in the EIR itself. The court also expressly rejected in its Intended Decision both the Foundation's challenge to the City's conclusion that a lease of the Mansion property would be infeasible, and the Foundation's challenge to the City's statement of overriding considerations.

The trial court thereafter entered a judgment granting the Foundation's petition. In the judgment, the court found that the FEIR failed to analyze the potential environmental impact associated with the Surplus Land Act and failed to adequately respond to a comment with regard to whether less land could be sold with the residence. The court's judgment also explicitly found "that economic analysis need not be included in the EIR." However, in contrast to the Intended Decision, the court's judgment stated that the "remaining issues" were "moot" and did not address them. The City timely filed a notice of appeal. The Foundation timely filed a notice of cross-appeal.

## III. The City's Appeal

### A. Surplus Land Act

The City challenges the trial court's finding that the FEIR was inadequate because it failed to analyze (1) "what uses could be made of the Mansion by an agency" purchasing the Mansion property under the Surplus Land Act and the potential environmental impacts of such uses and, (2) "the potential environmental consequences if the agency would not be constrained by any conditions that the City seeks to attach to the Mansion parcel."

## 1. Background

One of the letters commenting on the DEIR raised the issue of the application of the Surplus Land Act. "As the [D]EIR correctly notes, the Government Code provides that any proposed sale must go through a process which includes offering the property to other agencies before it is offered to the general public (i.e. to open space/park agencies, school districts and affordable housing providers.) No analysis is made in the DEIR of any impacts of these potential uses, which are foreseeable. The EIR must analyze the impacts of all possible alternatives."

The City responded to this comment in the FEIR by acknowledging that the project "will be subject to the requirements of the Surplus Land Act." "A number of public agencies will be offered the opportunity to purchase the Flanders Mansion property in accordance with the Surplus Land Act. Irrespective of who the ultimate purchaser may be, the future use of the property will be subject to the mitigation measures identified in this [DEIR], in addition to specific conditions of sale, which limit the future use of the property to those low-intensity uses that have historically occupied the Flanders Mansion site. . . . [A]ny analysis of the full array of potential uses that might otherwise be sought by agencies listed in the Surplus Land Act would involve a high degree of conjecture and speculation which is inappropriate in an EIR."

The FEIR also added text to the DEIR to address this issue. This text recited the provisions of the Surplus Land Act and then stated: "Whether any such agency will request to negotiate for purchase of the property or be able to purchase the property at fair market value, is unknown and speculative at this time. Likewise, whether any such agency will be able to comply with the mitigation measures, conditions of sale and covenants to be recorded to run with the land, and the use to which any such agency might put the property are also unknown and speculative at this time. [¶] As stated in this EIR, should any future use be proposed which presents potentially-significant environmental impacts which have not been analyzed in this EIR, additional environmental review in accordance with CEQA would be required. This requirement would apply to [these] agencies if any of them were to purchase the property and propose such a use." (Underscoring omitted.)

The FEIR also asserted that the DEIR's consideration of "a range of potential future uses" permitted in a P-2 zone, the current zoning for the Mansion property, was adequate with regard to the potential uses by an agency acquiring the Mansion property under the Surplus Land Act because any use by such an agency would be "similar in character or nature to the uses already specified and analyzed in the 2005 EIR and the 2009 [DEIR]."

(Underscoring omitted.) Furthermore, the FEIR also asserted that the mitigation measures specified in the DEIR and water availability constraints restricted future use of the property to its historical uses, thereby prohibiting uses such as a housing project or a school facility. In addition, the FEIR stated that any use that was not "within the parameters of the uses considered" in the DEIR "would trigger further environmental review." (Underscoring omitted.) Finally, the FEIR stated: "It should be noted that this site would not qualify for the CEQA affordable housing exemption (Guidelines §15191 *et seq.*) because, among other things, it is not in an 'urbanized area' as defined in the Guidelines, and such a project could be inconsistent with the existing zoning." (Underscoring omitted.)

The trial court found the FEIR inadequate with respect to the Surplus Land Act issue because the City "did not consider nor analyze the potential environmental impacts that might occur if an agency purchased or leased the Mansion parcel and the potential environmental consequences if the agency would not be constrained by any conditions that the City seeks to attach to the Mansion parcel." In the court's view, the FEIR was inadequate because it lacked "any analysis of what uses could be made of the Mansion by an agency, and 'precisely' what amount of water is available for the Mansion." The court found, on the same basis, that the City had failed to adequately respond to the comment letter regarding the Surplus Land Act issue.

### 2. Analysis

"Judicial review of an agency's decision to certify an EIR and approve a project 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.] Thus, we consider only whether the City failed to comply with CEQA or made determinations that were not supported by substantial evidence." (*Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1352 [46 Cal.Rptr.3d 902] (*PAC*); see Pub. Resources Code, § 21168.)

"[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of*

*California* (1988) 47 Cal.3d 376, 396 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel I*).) "We do not require prophecy. . . . Nor do we require discussion in the EIR of specific future action that is merely contemplated or a gleam in a planner's eye. . . . A detailed environmental analysis of every precise use that may conceivably occur is not necessary at this stage." (*Laurel I*, at p. 398.)

The issue here is whether the FEIR was inadequate in failing to explicitly analyze the potential environmental impacts of the possible uses that a potential purchaser under the Surplus Land Act might make of the Mansion property.

■ The applicable provisions of the Surplus Land Act are quite simple. When a local agency wishes to dispose of land it no longer requires (surplus land), the Surplus Land Act requires the local agency to send a written offer to sell or lease the property to certain entities for affordable housing or park purposes.[4] An offer "to sell or lease *for the purpose of developing low- and moderate-income housing* shall be sent to any local public entity, as defined in Section 50079 of the Health and Safety Code, within whose jurisdiction the surplus land is located" and, "upon written request," to "[h]ousing sponsors, as defined by Section 50074 of the Health and Safety Code . . . ."[5] (Gov. Code, § 54222, subd. (a), italics added.) An offer "to sell or lease *for park and recreational purposes or open-space purposes* shall be sent: [¶] (1) To any park or recreation department of any city within which the land may be situated. [¶] (2) To any park or recreation department of the county within which the land is situated. [¶] (3) To any regional park authority having jurisdiction within the area in which the land is situated. [¶] (4) To the State Resources Agency or any agency that may succeed to its powers."[6] (Gov. Code, § 54222, subd. (b), italics added.) If one of these entities notifies the local agency that it wishes to purchase or lease the land, "the disposing agency and the entity shall enter into good faith negotiations to determine a mutually satisfactory sales price or lease terms. If the price or terms cannot be agreed upon after a good faith negotiation period of not less than 60 days,

---

[4] "[T]he term 'surplus land' means land owned by any local agency, that is determined to be no longer necessary for the agency's use, except property being held by the agency for the purpose of exchange." (Gov. Code, § 54221, subd. (b).)

Provisions regarding offers to sell surplus land suitable for a school facility (Gov. Code, § 54222, subd. (c)), in an enterprise zone (Gov. Code, § 54222, subd. (d)), or in an infill opportunity zone (Gov. Code, § 54222, subd. (e)) are inapplicable here due to the nature of the property.

[5] The Legislature has declared that "there is a shortage of sites available for housing for persons and families of low and moderate income and that surplus government land, prior to disposition, should be made available for that purpose." (Gov. Code, § 54220, subd. (a).)

[6] "The Legislature reaffirms its belief that there is an identifiable deficiency in the amount of land available for recreational purposes and that surplus land, prior to disposition, should be made available for park and recreation purposes or for open-space purposes." (Gov. Code, § 54220, subd. (b).)

the land may be disposed of without further regard to [the Surplus Land Act]." (Gov. Code, § 54223.) "No provision of [the Surplus Land Act] shall be applied when it conflicts with any other provision of statutory law." (Gov. Code, § 54226.)

The Foundation's position and the trial court's ruling are based on the premise that a purchaser under the Surplus Land Act need not comply with the City's MMRP requirements or the recorded CC&R's containing the conservation easements. The Foundation contends that this is so because the Surplus Land Act *implicitly* "disallow[s] the addition of conditions on a proposed purchase" that might "thwart[] the stated goals of providing afford-able housing, recreation and park development." This *implicit* disallowance purportedly follows from the fact that the Surplus Land Act does *not* contain any provisions that *explicitly* "provide or imply that a 'disposing agency' may set conditions other than market pricing and timing of payments." (Italics omitted.)

■ We see nothing in the Surplus Land Act to support this premise. The Surplus Land Act contains no provision that explicitly prohibits a disposing agency from selling surplus property that is subject to mitigation conditions and conservation easements. While the provision regarding negotiations refers only to price (as to sale), mitigation conditions and conservation easements that have been created to comply with CEQA are *nonnegotiable*, as they are required by state statutory law. Since the Surplus Land Act explicitly states that none of its provisions "shall be applied when it conflicts with any other provision of statutory law" (Gov. Code, § 54226), it cannot reasonably be interpreted to preclude CEQA-required mitigation conditions and conserva-tion easements from being attached to surplus land.

The Foundation also argues that the FEIR was inadequate because it failed to consider whether a sale of the Mansion property to another agency or entity under the Surplus Land Act, unlike a sale to a private party, might deprive the City of "control in future decisions" and obviate the City's current zoning for the Mansion property. Assuming arguendo that a sale of the Mansion property under the Surplus Land Act might eliminate the City's future control over the property's zoning and future disposition, there was no need for the FEIR to contain any analysis of this issue because the City's mitigation conditions and conservation easements will necessarily bind any and all future owners of the property and thereby preclude any additional potential environmental impacts regardless of the City's power or lack of power to control the zoning or disposition of the property in the future.

The Foundation maintains that the FEIR is inadequate because it did not consider the potential environmental impacts "from the use of the mansion

for affordable housing." The FEIR was required to consider only "reasonably foreseeable consequence[s]" of the sale of the Mansion property, not "every precise use that may conceivably occur." (*Laurel I, supra,* 47 Cal.3d at pp. 396, 398.) It is not "reasonably foreseeable" that any public entity will decide to spend millions of dollars to buy and restore the Mansion property and accept the burden of the extensive mitigation measures and conservation easements for the purpose of using the property for affordable housing.[7] As the use of the Mansion property as affordable housing is not a "reasonably foreseeable" consequence of the sale of the property by the City, the FEIR was not required to consider the environmental impacts that might arise from this virtually inconceivable use of the property.[8]

Consequently, the FEIR was not inadequate with regard to the Surplus Land Act issue, and the trial court erred in upholding the Foundation's challenge on this basis.

### B. Comment Regarding Size of Parcel

The second basis upon which the trial court upheld the Foundation's challenge was the court's finding that the FEIR had failed to adequately respond to a comment suggesting that the City consider, as an alternative, selling the residence with a smaller parcel of land than the 1.252-acre parcel that the City proposed to sell.

When a comment raises a significant environmental issue, the lead agency must address the comment "in detail giving reasons why" the comment was "not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice." (CEQA Guidelines, § 15088, subd. (c); see *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel II*).)

After the DEIR circulated, the City received a comment that stated: "The mitigation possibilities are not analyzed sufficiently. A reduction in the size of the parcel to be sold or a conservation easement on a portion of the property

---

[7] The CBRE report stated that, after a bit more than $1 million in rehabilitation costs, the Mansion property would have a fair market value of $4 million as residential property. The Surplus Land Act does not require the disposing agency to sell the surplus land at less than its fair market value.

The City argues: "In the current political and economic climate, the idea that a Public Agency would undertake a project in excess of $2,000,000 to buy and prepare a single building to provide affordable housing in Carmel is absurd on its face."

[8] The Foundation does not contend, nor did the trial court find, that the sale of the Mansion property to an entity under the Surplus Land Act for park purposes would create potential environmental impacts that were not analyzed in the FEIR.

are suggested as potential mitigation." The FEIR provided no response to this comment's suggestion that a "reduction in the size of the parcel" would mitigate the environmental impacts of the proposed project. The trial court found that the FEIR was inadequate in this regard.[9]

The City contends that it was not required to respond to this comment because, "[t]hrough the imposition of the conservation easement, the total usable land area would be reduced to 0.752 acres consisting of several lawn areas immediately adjacent to the house and the circular driveway." "The alternative of reducing the parcel size does nothing more than what is already done by virtue of the conservation easement." The City argues that this "mitigation was sufficient," so it was not necessary to address the matter in the FEIR. In its view, "[i]t [was] completely reasonable for the City to have determined, as it did, that a further reduction of the lot size is not viable and would essentially leave the mansion without any land and thus be unmarketable."

■ The City's attack on the trial court's finding ignores the obvious. The City provided no response whatsoever in the FEIR to the comment's suggestion that the residence could be sold with a smaller parcel even though the comment raised a significant environmental issue. Since the proposed project would have an unmitigated significant environmental impact by eliminating parkland, the comment's suggestion reasonably questioned whether that impact could be reduced by reducing the size of the parcel. The City's obligation under CEQA was to explain in the FEIR "in detail giving reasons why" the City was not considering the sale of the residence with a reduced parcel. The City made no effort to satisfy its obligation. Its effort to conjure up reasons now is too late.[10] The purpose of CEQA is to inform both the

_____

[9] The trial court's statements were rather amorphous. As to the size of the parcel to be sold, the court stated: "To the extent this response is deemed inadequate, the future consideration of the City Council will include the essential information requested." As to the size of the parcel to be leased, the court stated: "As noted in the response to the comment about a reduction in the size of the parcel if the Mansion is sold, the City must analyze the foreseeable impacts that may result if an agency buys or leases the Mansion, to the extent the response to leasing a smaller parcel is deemed inadequate, any future consideration by the City Council will include the essential information requested."

[10] It is worth pointing out that the City's attempt to address the comment's suggestion on appeal is not supported by the record. The conservation easement merely prohibited visual barriers on certain portions of the parcel; it did not preserve any portion of the parcel as publicly accessible parkland, which was the unmitigated environmental impact at issue here. The CBRE report, which was the only evidence regarding the marketability of the Mansion property, strongly rebuts the City's suggestion that a smaller parcel would make the residence "unmarketable." The properties to which CBRE compared the Mansion property for valuation purposes all had much smaller parcels, and the CBRE report characterized the Mansion parcel as "very large . . . as compared to most competitive homes in the city."

public and the decision makers, *before the decision is made*, of any reasonable means of mitigating the environmental impact of a proposed project. The City's failure to respond to this significant comment violated its duty under CEQA, and the trial court correctly found that the City's certification of the FEIR was therefore invalid.

### C. Form of Judgment

The City, citing Code of Civil Procedure section 664, asks us to direct that the trial court's judgment be amended to conform to the court's Intended Decision. That statute states: "If the trial has been had by the court, judgment must be entered by the clerk, in conformity to the decision of the court, immediately upon the filing of such decision." (Code Civ. Proc., § 664.)

The court's Intended Decision explicitly rejected the Foundation's challenge to (1) the City's failure to include the economic feasibility analysis in the FEIR, (2) the adequacy of the economic feasibility analysis, (3) the City's conclusion that a lease of the Mansion property would be infeasible, and (4) the adequacy of the City's statement of overriding considerations. In contrast, the trial court's judgment explicitly rejected only the first of these challenges, stated that the "remaining issues" were "moot," and did not address them.

The trial court's judgment was not technically incorrect. Once the court invalidated the City's certification of the FEIR, the City's other resolutions necessarily became invalid. Therefore, the trial court was technically correct in characterizing the remaining issues as "moot." The Foundation reasserts each of these moot issues in its cross-appeal, and we address them, despite their technical mootness, in the interests of efficiency and justice.

### IV. The Foundation's Cross-appeal

The Foundation renews in its cross-appeal its challenges to (1) the City's failure to include the economic feasibility analysis in the FEIR, (2) the adequacy of the economic feasibility analysis to support the City's conclusion that the alternatives were infeasible, and (3) the adequacy of the City's statement of overriding considerations.

### A. Failure to Include Economic Feasibility Analysis in FEIR

The DEIR mentioned that an "economic analysis" was being prepared to "evaluat[e] the financial feasibility of the various project alternatives," but this analysis was not included in the DEIR. In response to comments regarding the absence of an economic feasibility analysis in the DEIR, the

FEIR stated that the CBRE economic feasibility analysis was available to the public at city hall and on the City's Web site, but was not required to be in the DEIR or FEIR.

The Foundation contends that the City was required to place the economic feasibility analysis in the DEIR, rather than elsewhere in the administrative record. It asserts: "When the feasibility of an alternative depends largely on economic factors, analysis should be in the EIR in order for the City Council to have adequate information on which to make its decision." The Foundation concedes that there are numerous cases holding that such economic analysis need not be in the EIR and may be elsewhere in the administrative record, but it argues that these decisions are incorrect.

█ "As is self-evident from its name, an EIR is an *environmental* impact report. As such, it is an informational document, not one that must include ultimate determinations of economic feasibility." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 689 [125 Cal.Rptr.2d 745] (*San Franciscans*).) "[A]lthough CEQA plainly provides that a reasonable range of alternatives must be included in the EIR, the statute does *not* require the EIR itself to provide any evidence of the feasibility of those alternatives, much less an economic or cost analysis of the various project alternatives and mitigating measures identified by the EIR. Instead, it *does* require the public *agency* to make findings and determinations as to the feasibility of such alternatives or mitigation measures with respect to each significant environmental impact which the EIR *identifies*, based on substantial evidence set forth anywhere 'in the record.' " (*San Franciscans*, at pp. 690–691.) This court has repeatedly taken the same position. "While it was not necessary for the evidentiary basis for this claim [of economic infeasibility] to be contained in the FEIR itself, it was necessary for such a basis to exist in the administrative record." (*PAC, supra*, 141 Cal.App.4th at p. 1356; see *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1003 [99 Cal.Rptr.3d 572] (*CNPS*).)

The Foundation relies on the Fourth District Court of Appeal's decisions in *Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866 [111 Cal.Rptr.3d 374] (*Center for Biological Diversity*) and *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437 [70 Cal.Rptr.3d 59] (*Round Valley*), but neither of these cases is on point. In both cases, the Fourth District did not consider whether the economic feasibility analysis must be in the EIR rather than elsewhere in the administrative record. Instead, the Fourth District simply concluded that the records in these cases contained no adequate economic feasibility analysis at all. (*Center for Biological Diversity*, at pp. 884–885; *Round Valley*, at pp. 1461–1462.)

Nor is the Foundation's reliance on *Laurel I* apt. In *Laurel I*, the California Supreme Court held that the EIR was inadequate because it did not contain a meaningful discussion of alternatives. "We hold the discussion in the EIR of project alternatives is legally inadequate under CEQA. UCSF must explain in meaningful detail in a new EIR a range of alternatives to the proposed project and, if UCSF finds them to be infeasible, the reasons and facts that UCSF claims support its conclusion." (*Laurel I, supra,* 47 Cal.3d at p. 406.) The issue that the California Supreme Court was concerned with in *Laurel I* was the general lack of an alternatives analysis, which obviously must be contained within the EIR, not the lack of a feasibility analysis. Hence, the court's statement was not directed at the issue of whether a feasibility analysis must be located in the EIR rather than elsewhere in the administrative record.

As the CBRE report did not address any environmental issues, the City was not required to include the report's economic feasibility analysis in the FEIR so long as it was included in the administrative record.[11]

## B. Challenge to Sufficiency of Evidence of Economic Infeasibility

### 1. Background

The CBRE economical feasibility report addressed the economic feasibility of the alternatives. First, it concluded that the cost to restore the Mansion property for lease or sale would be $1,157,000.[12] Second, it further concluded that the Mansion property, which it characterized as having "a very large [(1.25-acre)] lot as compared to most competitive homes in the city," had a value of $4 million as a single-family residence and a value of $2.04 million as a nonresidential property. The "comparable" homes that formed the basis for CBRE's residential appraisal had much smaller lots (the largest was 0.33 acres) even though several of these homes had 4,000 to 5,500 square feet of living space.[13] The appraisal stated that "larger lot sizes suffer from diminishing returns in comparison to smaller lots." The CBRE report concluded that a nonresidential sale "has remote economic feasibility" in a "very limited market" with "no comparables."

---

[11] The Foundation complains that the CBRE report was not released until after the close of the comment period. Since the FEIR explicitly referenced the CBRE report and notified the public that the report was available on the City's Web site, the public was not deprived of access to the basis for the City's economic feasibility analysis in advance of the city council's consideration of the FEIR and the project.

[12] The CBRE report also concluded that, if the City restored the property as a public facility, the restoration cost would be $1.41 million.

[13] Similarly, the nonresidential properties (all of which were office buildings) that were used as comparables to compute the value of a sale for nonresidential use were on much smaller lots, with the largest lot being less than half the size of the Mansion property's parcel.

With respect to the lease alternatives, the CBRE report estimated that the City's cost to restore the Mansion property would be repaid in 17 years if the Mansion property was leased for single-family use and in 8.7 years if the Mansion property was leased for nonresidential use. The report deemed a residential lease "economically infeasible" because "the market for comparable single-family rentals is exceedingly thin," and "the City would not recover its restoration costs for approximately 17 years." A nonresidential lease "did not meet the tests of economic feasibility," in CBRE's view, because there was "a very limited market," and it would take the City nine years to recover its restoration costs.

After certifying the FEIR, the City made a finding "that the Lease alternatives and the No Project alternative . . . are infeasible and do not achieve the primary project purpose." Based on the CBRE report, the City found that "leasing the Flanders Mansion property for either single-family residential use or public or quasi-public use" was "not feasible" for "economic reasons" because the market for such rentals was "exceedingly thin" or "non-existent," and it would take nine to 17· years to recover the City's cost of restoration. The City decided that it had "priorities" for its funds that were more important and "of greater value to the public" than rehabilitating and maintaining the Mansion property.

## 2. Analysis

The Foundation contends that the CBRE report did not contain substantial evidence that the environmentally superior alternatives were economically infeasible.

■ The feasibility of a potential alternative is relevant under CEQA at two different points. (*PAC, supra,* 141 Cal.App.4th at p. 1353.) One of these points occurs when a potential alternative's infeasibility has led to its exclusion from the range of alternatives subjected to detailed consideration in the EIR. (*PAC,* at p. 1353 [EIR should identify any alternatives rejected as infeasible during the scoping process along with the reasons why those alternatives were found infeasible].) Since the Foundation does not challenge the range of alternatives subjected to detailed consideration in the DEIR, we are not concerned with the feasibility of potential alternatives that were not considered in the DEIR.

In the case before us, the feasibility of the environmentally superior alternatives is at issue because, after certification of the FEIR, the City decided to approve a project that will have a significant environmental impact. Before a legislative body may approve a project with a significant environmental impact, it is "required to *make findings* identifying . . . the

'[s]pecific . . . considerations' that 'make infeasible' the environmentally superior alternatives . . . ." (*PAC, supra*, 141 Cal.App.4th at p. 1353; see *CNPS, supra*, 177 Cal.App.4th at p. 1007 (conc. opn. of Mihara, Acting P. J.).) The legislative body "shall base its findings on substantial evidence in the record." (Pub. Resources Code, § 21081.5.) We review the City's infeasibility findings for substantial evidence. (*CNPS*, at p. 997.)

The Foundation contends that the City's infeasibility findings are not supported by substantial evidence in the record.[14] We disagree. The DEIR analyzed four project alternatives: the no project alternative, the residential lease alternative, the public lease alternative, and the sale plus alternative. The City concluded that the no project alternative and the two lease alternatives, all of which would have fewer environmental impacts than the proposed project, were infeasible based on the CBRE report. The CBRE report extensively analyzed the local real estate rental market and determined that it would be very difficult, if not impossible, for the City to lease the Mansion property, and that the revenue that the City could expect to receive from a lease would not recompense the City for the cost of restoring the Mansion property (to make it available for lease) for nearly a decade or more. The no project alternative would leave the City in the position of remaining liable for ongoing maintenance costs without any viable use for the Mansion property. The City explicitly found that the financial drain on the City's resources made these alternatives infeasible.

The Foundation nevertheless asserts that the CBRE report does not provide substantial evidence to support the City's findings because the CBRE report "does not look at comparable park/mansion properties, City maintenance expenses, City budget and funding capabilities, nor the financial feasibility of any of the myriad potential quasi-public uses suggested by the Flanders Foundation and others."

The CBRE report cannot be faulted for having failed to find "comparable park/mansion properties," as the lengthy CBRE report reflects that CBRE looked for, but could not find, any such comparable properties. While information about the City's maintenance expenses might have been relevant to the economic feasibility of the no project alternative, it was not relevant to the two lease alternatives, as the CBRE report determined that the City would be required to restore the Mansion property, at a cost exceeding $1 million,

---

[14] The Foundation claims that the alleged inadequacy of the evidence affects the validity of the FEIR. Not so. Since these infeasibility findings occurred after the certification of the FEIR, they did not affect the validity of the FEIR itself but only the validity of the City's CEQA-required findings.

before the property could be leased. The City could have reasonably concluded that continuing to pour *any* amount of maintenance expenses into a vacant and decaying building in a park was an inappropriate use of City resources.

 The City's "budget and funding capabilities" were not relevant. "[T]he [feasibility] question is not whether [the City] can afford the proposed alternative, but whether the marginal costs of the alternative as compared to the cost of the proposed project are so great that *a reasonably prudent property owner* would not proceed with the [alternative]." (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 600 [54 Cal.Rptr.3d 366], italics added.)

The CBRE report supported the City's finding that the marginal costs of the lease alternatives so greatly exceeded the cost of the project that no reasonable property owner would proceed with either of the lease alternatives. The CBRE report projected that the City could reasonably expect to sell the property for $4 million if it invested $1.4 million in restoring it. In contrast, the lease alternatives would require the City to invest the same amount of money to prepare the property for lease in an exceedingly thin to nonexistent rental market where, even if the property could be leased, it would take nearly a decade or more to recover that investment. A reasonable property owner would not select either of the lease alternatives due to the unlikelihood of a successful lease and the prospect that the investment would be for naught.

The CBRE report also supported the City's finding that the marginal cost of the no project alternative significantly exceeded the marginal cost of the project. If the City retained the property (no project), the City would be burdened with maintenance costs without any corresponding value, as the property was too dilapidated to be used without restoration. In contrast, the City was likely to reap millions of dollars from the restoration and sale of the property. A reasonable property owner would not choose to forgo such a significant financial benefit in favor of retaining ownership of a property that required the regular investment of maintenance costs but could not be used.

The City could properly rely on the CBRE report's conclusion that there was not a viable lease market for any "quasi-public" use that would justify the City's investment of such a significant amount of City funds on the mere hope that the property might someday generate recompense.

 The Foundation also contends that the City's infeasibility findings did not "prove that lease of the Mansion to a single-family or non-profit organization could not accomplish most of the project objectives." That is not

the standard. If it were, a legislative body could never reject an alternative. The entire purpose of the alternatives section in an EIR is to consider environmentally superior alternatives that would "accomplish most of the project objectives." The DEIR did so. All of the alternatives would accomplish most of the project objectives. Nevertheless, a legislative body may reject such alternatives if it properly finds them too infeasible for any of the statutorily specified reasons, including economic infeasibility. (*CNPS, supra*, 177 Cal.App.4th at p. 1007 (conc. opn. of Mihara, Acting P. J.) [". . . CEQA explicitly permits the legislative body to make a postcertification determination that these potentially feasible alternatives are *not actually feasible*, so long as the legislative body makes the requisite findings citing specific reasons for its infeasibility determination."].) The City did so here. The City was not required to establish that *infeasible* alternatives could not establish most of the project's objectives. Indeed, the City conceded the opposite in the DEIR. Nevertheless, an alternative that is infeasible need not be selected over a feasible alternative, in this case the sale plus alternative selected by the City. Substantial evidence supports the City's infeasibility findings.

## C. Overriding Considerations

The Foundation also challenges the City's statement of overriding considerations.

When a project will have a significant environmental impact and the alternatives have been properly found to be infeasible, the project may be approved only if "the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (Pub. Resources Code, § 21081, subd. (b).) "[A]n agency's decision that the specific benefits a project offers outweigh any environmental effects that cannot feasibly be mitigated, while subject to review for abuse of discretion (Pub. Resources Code, § 21168.5), lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned." (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 368 [46 Cal.Rptr.3d 355, 138 P.3d 692].)

The City's statement of overriding considerations found that the benefits of the sale plus alternative outweighed the unavoidable environmental impact of the project. The City identified these benefits as: (a) "ensure that the Flanders Mansion property is put to an appropriate use, consistent with its historic importance and use, while protecting the nearby residential neighborhoods from significant increases in traffic, parking and noise"; (b) "ensure, in particular, the restoration, rehabilitation and long-term maintenance of the Flanders Mansion historic resource"; (c) "ensure that: (1) the Flanders

Mansion is preserved as a historic resource; (2) the Flanders Mansion building and property are put to productive use; future use of the Flanders Mansion and property will not cause significant traffic, parking or noise impacts on the surrounding neighborhood; (3) future use will not significantly disrupt the public's enjoyment of the Mission Trails Nature Preserve or the Lester Rowntree Native Plant Garden; (4) environmental resources of the park are protected and the Flanders Mansion parcel continues to provide the public with as many park benefits as are practical in light of such a sale, achieving the remaining secondary project objectives"; (d) "may return the property to the tax rolls"; (e) reduce the City's liability associated with its ownership of the Mansion property; (f) relieve the City of the financial burden of maintenance, repair, and historic rehabilitation; (g) "preserve and protect biological resources"; (h) "establish a land use that is compatible with the nearby Hatton Fields neighborhood and consistent with the purpose for which the Mansion was originally built"; and (i) allow the citizens to decide by election whether the Mansion property should be sold.[15] The City found that these benefits "outweigh any and all potential unavoidable adverse impacts of the Project." It also found that "*each* of the benefits . . . is a *separate and independent ground* for its findings that the benefits of the Project outweigh any and all potential significant and unavoidable adverse environmental impacts of the Project." (Italics added.)

The Foundation assaults each of the benefits identified in the City's statement, but we need not consider all of them as the City's statement clearly expressed its finding that "each" of the identified benefits was individually sufficient to outweigh the environmental impact of the project. The key benefit identified by the City was that the Mansion property would be restored and maintained in the most environmentally sensitive manner feasible without the City bearing the expense of restoration and maintenance. The Foundation insists that this is not a benefit of the project because restoration and maintenance of the Mansion property "can be achieved" without selling the Mansion property. This argument ignores the fact that, as we have already discussed, substantial evidence supports the City's finding that it would be economically *infeasible* for *the City* to retain ownership of the Mansion property and restore and maintain the property using City funds. The infeasibility of that option means that the City's only remaining option to ensure the restoration and maintenance of the Mansion property is to sell the property with appropriate mitigation measures designed to ensure that the

---

[15] Because the Mansion property is parkland, the City could "discontinue and abandon the use as a public park" only with approval of the city electors. (Gov. Code, § 38440; see *id.*, § 38443.) Once the proposal had been approved by the voters and the City had adopted an ordinance, it could "sell or otherwise dispose of the property in the same manner as it may dispose of other city property no longer required for municipal purposes." (Gov. Code, § 38460.)

property is properly restored and maintained in an environmentally sensitive manner. We can find no abuse of discretion in the City's decision that the sale of the Mansion property accompanied by restoration and maintenance of the property in an environmentally sensitive manner would be more beneficial than the City's retention of a small parcel of parkland containing a dilapidated unusable structure for which the City was required to continue to shoulder both liability and maintenance expenses. This decision was well within the City's discretionary responsibility under CEQA.

## V. Disposition

The trial court's judgment is hereby modified to delete the court's finding that the FEIR failed to adequately address the Surplus Land Act issue. As so modified, the judgment is affirmed. The parties shall bear their own costs on appeal.

Duffy, J.,* and Walsh, J.,† concurred.

A petition for a rehearing was denied January 31, 2012.

---

*Retired Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.