Filed 7/22/14  Save  Our heritage Organisation v. County of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAVE OUR HERITAGE ORGANISATION, | D064006 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2012-00100958) |
| COUNTY OF SAN DIEGO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Reversed and remanded with directions.

Thomas E. Montgomery, County Counsel, and C. Ellen Pilsecker, Chief Deputy County Counsel, for Defendants and Respondents.

Brandt-Hawley Law Group and Susan L. Brandt-Hawley for Plaintiff and Respondent.

The County of San Diego, the Board of Supervisors of the County of San Diego, and the County of San Diego Department of General Services (together, the County)

appeal a judgment directing the County to set aside its certification of an environmental impact report (EIR) for, and approval of, a project to demolish a County-owned historical building and replace it with commercial and residential buildings. Upon the petition of Save Our Heritage Organisation (SOHO), the trial court ruled the certification and approval violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1] We reverse.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Project*

The EIR analyzes a proposed mixed-use development, referred to as the "Cedar and Kettner Development Project" (the Project), on County-owned property in downtown San Diego. The property is bounded on the north by Cedar Street, on the east by Kettner Boulevard, on the south by Beech Street, and on the west by railroad and trolley rights-of-way. As of June 2012, the parcel contained a parking lot over the northern two-thirds of the project site, and the southern one-third contained two structures, the three-story Star Builders Supply Company office building (Star Building) and a warehouse.

The Star Building is a city-designated historical structure. It was built in 1911 to serve as a warehouse to store goods delivered via the railroad line at the west edge of the Project site. An oil company occupied the site from 1948 to 1973, during which time petroleum hydrocarbons contaminated the site. The greatest concentrations of

---

1 Subsequent undesignated section references are to the Public Resources Code.

2

contaminants were found in the southwest portion of the Project site, including directly under the Star Building.

As stated in the EIR, the Project has four goals: (1) to provide adequate parking close to the County Administration Center (CAC),[2] (2) to allow development of part of the site through a public-private partnership, (3) to "[m]aximize the County's potential return from development of a portion of the site through a public-private partnership," and (4) to obtain LEED[3] certification for phases 2a and 2b of the Project by incorporating "green" energy design features. Development of the Project would occur in three phases.

Phase 1 includes demolition of the Star Building and the warehouse, site grading, soil remediation, and construction of a parking garage. According to the EIR, demolishing the Star Building would constitute a significant adverse impact on the environment. (See § 21084.1 ["A project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment."].) That impact cannot be mitigated without altering plans for the

---

[2]     The construction of adequate parking close to the CAC is a mitigation measure the County is required to undertake by a separate EIR certified in 2003 for the development of a park at the CAC.

[3]     LEED is an acronym for Leadership in Energy and Environmental Design, a "set of rating systems for the design, construction, operation, and maintenance of green buildings, homes, and neighborhoods." (<http://en.wikipedia.org/wiki/Leadership_in_ Energy_and_Environmental_Design> [as of July 18, 2014].).

parking structure because vehicular access lanes to the structure are located in the footprint of the Star Building.

Subsequent Project phases, addressed in the EIR as phases 2a and 2b, contemplate a partnership between the County and a private developer to achieve the second and third Project goals of maximizing the County's potential return from development through the partnership. No development partner had agreed to develop phases 2a or 2b as of the date of Project approval.

In phase 2a, a public-private partnership would develop a five-story office and retail building on the Project site east of the parking structure along Kettner Boulevard. In phase 2b, the partnership would build a 19-story residential structure that would occupy the Star Building footprint. This phase has significant potential to generate revenue for the County. According to a report prepared by Keyser Marston Associates, Inc. (KMA), a consulting firm that provides real estate advisory services, the residual land value of the Project was $4,817,000.[4] The residual land value was defined as "the purchase price a developer can feasibly afford to pay for a property after taking into consideration all of the development costs (excluding land), economic value (rental and for-sale revenue), and target profit." In other words, it is the amount a developer would pay the County for those portions of the site not used for the phase 1 parking structure. The revenue from the Project will derive primarily from the sale of 163 residential units

_____

[4]     The KMA analysis did not consider the costs of remediating the contaminated soil under the Star Building. An analysis by the environmental consulting firm Ninyo & Moore estimated these costs to be $2,108,700.

4

in the 19-story building planned in phase 2b, the net proceeds of which KMA estimated to be $79,240,000.

B.    *Alternatives to the Project*

The EIR analyzed two alternatives in addition to the "no project," or status quo, alternative.  The "no project" alternative, of course, would retain the site in its current condition, leaving the surface parking lot, the Star Building, and the warehouse all as they are.

The first Project alternative, "Build Alternative #1," would incorporate the Star Building into the development by converting its first floor into a lobby, community room, and fitness center for the residential units.  Build Alternative #1 also would include soil remediation, construction of a parking garage, construction of a mixed-use office and retail building, and construction of 65 residential units located on five floors.  According to the EIR, this alternative would accomplish two of the four Project goals:  it would provide a sufficient amount of parking for CAC employees, and it would allow the County to develop part of the site through a public-private partnership.  Build Alternative #1 would also mitigate adverse environmental impacts to historical resources by incorporating the Star Building into the design.  The EIR notes, however, that this alternative would not maximize the County's financial return from the Project because it would have many fewer residential units than the Project due to "structural constraints" imposed by incorporating the Star Building as part of the overall development.  KMA estimated the net proceeds from the sale of residential units for Build Alternative #1 would be $26,913,000, and the residual land value would be *negative* $288,000.

5

The second Project alternative, "Build Alternative #2," would allow parking and residential development onsite, without either removal of the Star Building or integration of the Star Building into the new development. Under this alternative, the Star Building would stand alone and be used for office space. The additional development contemplated by Build Alternative #2 would occur in two stages. First, the County would build a parking garage on the northern two-thirds of the site. Second, a private developer would construct a mixed-use building containing 65 residential units on five floors. The final EIR stated Build Alternative #2 was the environmentally superior alternative because it retained the Star Building and met most of the project objectives. Like Build Alternative #1, however, Build Alternative #2 would not achieve the County's goal of maximizing financial return from the Project because it would include many fewer residential units than the Project. KMA estimated the net proceeds from the sale of residential units for Build Alternative #2 would be $29,601,000, and the residual land value would be $654,000.

C.    *Public Comments on the Project*

During public review of the draft EIR, the County received several comment letters, three of which are at issue on this appeal. The County's historic site board commented that "Project alternatives discussed in the [EIR] should include the preservation of the [Star Building] through [p]hase 1." The environmental review committee of the County's archaeological society suggested adoption of Build Alternative #2 "with increases in the number of dwelling units above the garage, to improve the return to the County." SOHO commented that the County should consider a

6

non-demolition alternative that would convert the Star Building into a hotel. The County prepared written responses to these comments.

In response to the historic site board's one-sentence comment, the County devoted six paragraphs. The County noted the alternatives analyzed in the EIR (Build Alternatives #1 & #2) would preserve the Star Building. The County also noted several factors that made infeasible delaying demolition of the Star Building until after the parking structure was built. The County referenced the KMA report in stating that demolition of the Star Building was necessary to obtain maximum economic return from the Project. The County referenced a geotechnical report in stating it would be more cost-effective to remediate the contaminated soil on the entire site at one time rather than remediating a portion of the site in phase 1 and the other portions later. The County also pointed out that if the Star Building were left in place during phase 1, a private developer would have to get approval from the City of San Diego to demolish it later, which might not be granted after a costly process of seeking approval. The County stated the site would be more marketable once all structures were removed and the contaminated soil remediated. Finally, the County asserted that retaining the Star Building during phase 1 would physically interfere with construction of the parking structure and increase construction costs.

In response to the one-paragraph comment of the archaeological society environmental review committee, the County devoted six paragraphs. The County stated the comment proposed a variation of Build Alternative #2 and so did not require separate analysis in the EIR. The County also explained that constructing additional residential

7

units above the garage, as suggested in the comment, was not feasible for several reasons. Such construction would delay the implementation of phase 1 of the Project, with which the County wished to proceed as soon as possible, because major structural elements needed to support the residential units above the parking garage would have to be incorporated into the garage and would have to be designed by the then-unidentified private developer of phase 2. The need to incorporate a structural support system into the garage would also significantly increase the cost of building the garage. Further, building additional residential units above the parking garage would produce much less revenue than the Project because the horizontal dimensions of the garage and local ordinances regarding sunlight access would reduce the number of units allowed and require a costlier terraced structure.

In response to SOHO's two-sentence comment, the County devoted four paragraphs. The County initially pointed out that because the EIR included alternatives that would preserve the Star Building (Build Alternatives #1 & #2), discussion of another similar alternative (SOHO's proposed hotel alternative) was not required. In addition, the County stated that since it does not plan, develop, or operate hotels, a private developer would have to do so; but a private developer (unlike the County) would be subject to applicable zoning restrictions, which do not permit a hotel on the site. Finally, the County noted its market analysis did not consider demand for hotels because they are not permitted by the zoning at the site, and SOHO had submitted no evidence that there was a demand for a hotel at the site, that a hotel use would be permitted as an exception to the

existing zoning, or that a hotel developer would pay the County more for the site than a developer of the Project would pay.

D.    *The County's Approval of the Project*

The County, through its Board of Supervisors, certified the Project EIR for compliance with CEQA; adopted findings concerning mitigation of significant environmental impacts, including findings that the project alternatives were infeasible; adopted a statement of overriding considerations for the Project's unmitigable environmental impacts; and approved the Project.[5]  The County also authorized a contract for site preparation and demolition of the Star Building, and a design-build construction contract for the parking structure planned for the Project's first phase.

E.    *Trial Court Proceedings*

SOHO filed a petition for a writ of mandate in the trial court, seeking to set aside the County's approval of the Project.  SOHO contended the County violated CEQA because (1) the "Project objectives listed in the EIR were inadequate and unlawful," (2) the "EIR failed to consider a reasonable range of alternatives," (3) the "EIR analysis of alternatives and mitigations is inadequate and incomplete," and (4) the "conclusions of the EIR are not supported by substantial evidence."

Over the County's opposition, the trial court issued the writ.  The court ruled the County's objective to maximize potential return from development of a portion of the site

---

5    Because the Statement of Overriding Considerations is not at issue in this appeal, we do not discuss it further.

through a public-private partnership was "unduly narrow," "adversely colored" the County's analysis of Project alternatives, and caused it to "dismiss[] alternatives as infeasible" because they would be less profitable than the Project. The court also ruled the County's responses to public comments were insufficient, and the record did not contain substantial evidence to support the feasibility findings of the EIR.

## II.

## DISCUSSION

The County contends the trial court erroneously ruled that (1) adoption of a project objective to maximize financial return from a development through a public-private partnership constitutes an abuse of discretion because it precludes meaningful consideration of project alternatives, (2) substantial evidence does not support the County's findings that the alternatives to demolition discussed in the EIR were infeasible, and (3) the County's responses to public comments were conclusory and speculative. As we shall explain, these contentions have merit and require reversal of the judgment.

A. *Standard of Review*

A court's inquiry in an action to set aside a public agency's decision on the ground of noncompliance with CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1161.) "Courts presume that the agency's decisions are correct, and the challenger bears the burden of proving to the contrary." (*San Diego Citizenry Group v. County of San Diego* (2013) 219

10

Cal.App.4th 1, 11 (*San Diego Citizenry Group*).) " ' "The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' " (*In re Bay-Delta etc.*, *supra*, p. 1161.) " 'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' " (*In re Bay-Delta etc.*, *supra*, p. 1162.)

B.      *Propriety of Adoption of Objective to Maximize Return from Development*

        The parties' primary dispute on appeal concerns the trial court's ruling that the County failed to proceed in a manner required by law when it adopted as one of the Project objectives the maximization of financial return from the development through a public-private partnership. The County contends the court erred in so ruling because CEQA does not restrict a public agency's choice of project objectives and because the objective served CEQA's purposes. Defending the trial court's ruling, SOHO asserts: "Project objectives may not create a minutely-detailed blueprint that only the project can meet. That sort of tautology would preclude meaningful consideration of alternatives that can reduce [environmental] impacts." SOHO complains the County's adoption of maximization of return through a public-private partnership as a Project objective "essentially poisoned the EIR process" because pursuit of that objective "would trump [less profitable] alternatives that reduce environmental impacts and would thereby automatically defeat the salutary objectives of CEQA." To prevent the County from undermining CEQA in this way, SOHO vigorously urged us at oral argument to hold that

11

CEQA prohibits a public agency from adopting maximization of financial return as a project objective. Indeed, SOHO predicted that if we did not so hold, the County could use the objective of maximizing return from development to approve projects that would demolish every historical building in San Diego County.

SOHO's briefing and oral arguments do not persuade us to adopt a categorical prohibition against using maximization of return from development as a project objective and affirm the trial court's ruling on that ground. Rather, for the reasons discussed below, we agree with the County that under CEQA, its associated guidelines, and existing case law, the court erred. Adoption of maximization of return from development through a public-private partnership as one of the Project objectives did not *by itself* constitute a failure to "proceed[] in a manner required by law." (§ 21168.5.)

First, neither CEQA nor its implementing regulatory guidelines (Guidelines; Cal. Code Regs., tit. 14, § 15000 et seq.) prohibit a public agency from adopting a project objective of maximizing return from development through a public-private partnership. CEQA itself does not require an EIR to include a list of project objectives. (See § 21100 [specifying content of EIR].) The Guidelines require an EIR to contain "[a] statement of the objectives sought by the proposed project," but they do not impose any substantive limitations on those objectives. (Guidelines, § 15124, subd. (b).) The courts may not interpret the statutory or regulatory provisions regarding the required content of an EIR "in a manner which imposes procedural or substantive requirements beyond those explicitly stated in [CEQA] or in the [Guidelines]." (§ 21083.1; see *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144

12

Cal.App.4th 890, 899 ["When interpreting CEQA, courts are not authorized to impose requirements not present in the statute."].)  Hence, "CEQA does not restrict an agency's discretion to identify and pursue a particular project designed to meet a particular set of objectives."  (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 276-277; accord *San Diego Citizenry Group*, *supra*, 219 Cal.App.4th at p. 14.)  In urging us to adopt a categorical rule prohibiting the use of maximization of return from development as a project objective, SOHO is "asking that we arrogate to ourselves a policy decision which is properly the mandate of the [County]. We cannot."  (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1269.)

Second, one goal of any project involving private capital is the maximization of return on investment, whether or not the EIR expressly so states.  No developer using private funds "is likely to proceed with a project that will not be economically successful."  (*Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 449 (*Maintain Our Desert Environment*).)  "[I]t is assumed in a capitalistic society that one is motivated by a desire for economic return on one's labor and investment."  (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1401.)  The County's decision to state as an explicit project objective a goal that is implicit in every privately funded development project did not invalidate the EIR.  (Cf. *id.* at pp. 1400-1401 [rejecting as "specious" a contention an EIR was invalid because it did not explicitly state project intended to operate for profit].)

Third, maximization of some quality or quantity is inherent in any project objective.  For example, a housing project for the poor would seek to build the maximum

13

number of affordable housing units with the available funding and space; a project to make a community "green" would seek to maximize the use of wind, solar, and other alternative energy sources while minimizing the use of fossil fuels; and a project to provide parking would seek to construct the maximum number of parking stalls with the available funding and space. Further, any given project is likely to have multiple, and perhaps competing, objectives, and project alternatives will meet different objectives to different extents. It is a policy decision for the agency to select the alternative that strikes the best balance. "Ranking the relative importance of the various objectives in the overall context of the [P]roject was a policy decision entrusted to the [County]. The [County's] ultimate determination that [maximizing return from the Project through a public-private partnership] was a key objective of the [P]roject does not undermine the legitimacy of the EIR's alternatives analysis." (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 992 (*California Native Plant Society*).)

Fourth and finally, whether a public agency abused its discretion in adopting a particular project objective cannot be decided in the abstract. Under CEQA, project objectives are not ends in themselves; they are means to the end of creating an EIR that "give[s] the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the environment but also informed self-government." ' " (*In re Bay-Delta etc.*, *supra*, 43 Cal.4th at p. 1162.) Project objectives facilitate reaching this end by "help[ing] the lead agency develop a reasonable range of alternatives to evaluate in the EIR" and by "aid[ing] the decision makers in preparing findings or a statement of overriding considerations, if necessary." (Guidelines, § 15124,

14

subd. (b).)  We agree with SOHO that an "agency may not give a project's purpose an artificially narrow definition" (*In re Bay-Delta etc.*, *supra*, at p. 1166); rather, it must state project objectives "broadly enough to leave room for consideration of alternatives that reduce [environmental] impacts."  Thus, whether an agency proceeds as required by law depends on whether in pursuing its objectives the agency satisfies its obligations under CEQA and the Guidelines to prepare an EIR that allows for informed decisionmaking by giving meaningful consideration to project alternatives with reduced environmental impacts.  As we discuss below, in pursuing its objective to maximize return from development through a public-private partnership, the County prepared an EIR that analyzed a reasonable range of alternatives as required by CEQA and, based on that analysis, properly determined the alternatives were not feasible.

C. *Adequacy of the Range of Project Alternatives Analyzed in the EIR and Sufficiency of the Evidence to Support the County's Findings the Alternatives Were Infeasible*

The County next challenges the trial court's ruling that substantial evidence does not support the County's feasibility findings regarding the Project alternatives analyzed in the EIR.  The court rejected as "unsupported" the County's contention "that it is economically more feasible to remove the Star Building prior to securing a private development partner."  The court also ruled the County gave "no meaningful consideration of project alternatives" because the "unduly narrow project objective to maximize profits" made the range of alternatives "inadequate" and the alternatives were

15

"similar to one another" but "vastly different from the approved project."  In so ruling, the court erred.6

"CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR."  (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566.)  The statute requires an EIR to include a detailed statement describing alternatives that would substantially lessen the significant environmental impacts of the proposed project.  (§§ 21002, 21100, subd. (b)(4).)  The Guidelines are more specific:

> "An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives.  An EIR need not consider every conceivable alternative to a project.  Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation.  An EIR is not required to consider alternatives which are infeasible.  The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives.  There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason."  (Guidelines, § 15126.6, subd. (a).)

Hence, "an EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project . . . which:  (1) offer substantial environmental advantages

---

6    The County contends SOHO "waived" any challenge to the alternatives analyzed in the EIR because it did not challenge them in the trial court.  Indeed, in the trial court SOHO asserted "the adequacy of the Star Building's Draft EIR discussion of alternatives is not one of the issues before this Court," and it "has not argued that the Draft EIR's range of alternatives was insufficient."  On appeal, SOHO asserts any consideration of the feasibility of Project alternatives is "arguably premature," but urges us to affirm the trial court's ruling on the issue should we reach it.  Because the trial court decided the issue, both parties briefed it on appeal, and we "may affirm the trial court's ruling on any ground supported by the record" (*Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 573, fn. 5), we address the issue on the merits.

16

over the project proposal [citation]; and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved." (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, at p. 566.) The agency's selection of alternatives will be upheld unless the alternatives "are manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265 (*Federation of Hillside & Canyon Associations*).)

Here, the EIR analyzed a "no project" alternative, as required by the Guidelines. (Guidelines, § 15126.6, subd. (e).) That alternative would leave the Star Building as is, thereby preserving an historical resource, and would avoid all other adverse environmental impacts of the Project, but it would not accomplish any of the Project objectives. The EIR also analyzed two other alternatives that would preserve the Star Building but would allow some development of the Project site. Build Alternative #1 would incorporate the Star Building into a mixed commercial-residential building and build a parking structure. Build Alternative #2 would leave the Star Building standing alone and construct a mixed commercial-residential building and a parking structure on the remainder of the site. These alternatives would reduce the adverse environmental impacts of the Project by preserving the Star Building and would meet the County's goals regarding parking. They would also have adverse impacts on air quality, noise, geology/soils, and hazardous materials and hazards similar to or less than those of the Project. But neither Build Alternative #1 nor Build Alternative #2 would achieve the objective of maximizing return through a public-private partnership, because retention of

17

the Star Building would limit construction of residential units to only 40 percent of the number contemplated by the Project.

The range of project alternatives analyzed in the EIR was not "manifestly unreasonable." (*Federation of Hillside & Canyon Associations*, *supra*, 83 Cal.App.4th at p. 1265.) The range included all of the obvious types of alternatives to the demolition of the Star Building and development contemplated by the Project — retention of the Star Building at the site unchanged (the "no project" alternative), retention at the site as a stand-alone building with development of the rest of the site (Build Alternative #2), and incorporation into the development at the site (Build Alternative #1) — and the adverse environmental impacts of each type of alternative compared to those of the Project were fully evaluated. Although many variations of the alternatives analyzed (such as those specifying a different use for the Star Building, a different size or location for the parking structure, or a different number or configuration of commercial and residential units) undoubtedly existed, "[a]n EIR need not consider every conceivable alternative to a project." (Guidelines, § 15126.6, subd. (a).) "This EIR should 'not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated.' [Citation.] [¶] 'Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.' " (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029.) The alternatives considered by the County "represent enough of a variation to allow informed decisionmaking." (*Mann v. Community Redevelopment Agency* (1991) 233 Cal.App.3d 1143, 1151.)

Having determined the EIR analyzed a reasonable range of alternatives to the Project, we must next determine whether substantial evidence supported the County's findings the alternatives were not feasible. For purposes of CEQA, " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.) Before a public agency may approve a project for which an EIR identifies a significant environmental impact, the agency must make a finding that "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR]." (§ 21081, subd. (a)(3).) Such a finding must be based on "substantial evidence in the record." (§ 21081.5.) "[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) According to the Guidelines, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) In reviewing the record for substantial evidence, we presume the agency's findings are correct and resolve all conflicts and reasonable doubts in favor of the findings. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 881-882; *California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 997.)

Applying this deferential standard of review, we conclude the County did not prejudicially abuse its discretion in finding the project alternatives were infeasible. The County properly rejected the "no project" alternative as infeasible because it would

19

achieve none of the objectives stated in the EIR. (See *San Diego Citizenry Group*, *supra*, 219 Cal.App.4th at pp. 17-18 [alternative is infeasible when it would defeat project objectives].) The County also properly rejected Build Alternatives #1 and #2 as infeasible. An environmentally superior alternative may be deemed infeasible if "the additional costs *or lost profits* are so severe the project would become impractical." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 736, italics added.) The question is " 'whether the marginal costs of the alternative as compared to the cost of the proposed project are so great that *a reasonably prudent property owner* would not proceed with the [alternative].' " (*The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 622.) In answering that question, the County considered the analysis prepared by KMA, which calculated the residual land value (i.e., the amount a developer would pay the County for the portions of the site not used for the parking structure), as $4,817,000 for the Project, *negative* $288,000 for Build Alternative #1, and $654,000 for Build Alternative #2. Such expert analysis constitutes substantial evidence upon which a public agency may rely in making CEQA findings. (§ 21080, subd. (e)(1); *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 681-682.) Therefore, given the large disparity between the revenue to the County that would be generated by the Project and the revenue that would be generated by either alternative, the County reasonably found the lost profitability of both alternatives made them economically infeasible. (See, e.g., *The Flanders Foundation*, at p. 622 [upholding infeasibility finding when expert

20

report estimated sale of historic resource would net city $2.6 million, but lease alternatives would not generate any net revenue for a decade or more].)[7]

SOHO urges us to affirm the trial court's ruling that substantial evidence does not support the County's findings the alternatives were infeasible. In doing so, SOHO does not contest the methodology used in the KMA report on which the County relied, but instead contends, without citing any authority, that the County's findings "are insupportable because they rely on an economic report assuming the viability of the wildly speculative high-rise." More specifically, SOHO complains the KMA report "does not provide real numbers" because the report is based on the assumption "that *if* [the County] could attract a private developer in the future and create a partnership for a high-rise project, it would likely make more money than if it did something else." At oral argument, SOHO added that the figures in the KMA report should be disregarded

---

[7] The County's express reliance on the comparative economic analysis done by KMA in specifically finding the project alternatives infeasible distinguishes this case from those on which SOHO relies. In the cases cited by SOHO, the agency made no specific finding of economic infeasibility or the record did not contain substantial evidence that reduced profitability of project alternatives made them impractical. (See *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1462 [the record contained "no evidence or analysis whatsoever of the comparative costs or profitability of developing the two parcels"]; *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1355-1356, 1357 (*Preservation Action Council*) [the agency "failed to make a specific finding regarding the infeasibility of the reduced-size alternative," and the "administrative record does not contain any evidence that the reduced-size alternative would be so much less profitable and produce so many fewer tax dollars that the project would be impractical"]; *Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1181 [the "scant figures contained in the administrative record [were] not sufficient to support" the conclusion that "additional costs or lost profitability [were] sufficiently severe as to render it impractical to proceed with the project"].)

21

because the County could make more money by keeping the Star Building in place and simply reconfiguring phase 2 of the development to increase the number of residential units above those considered in Build Alternatives #1 and #2. We reject these contentions.

Under CEQA, "the feasibility of the alternatives must be evaluated *within the context of the proposed project*." (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 599, italics added.) The proposed project here included construction of a parking garage (phase 1) followed by construction of a five-story commercial building (phase 2a) and a 19-story residential building (phase 2b). Thus, to determine whether the alternatives were economically feasible, the County had to compare the revenue expected from the alternatives to the revenue expected from construction of the proposed 19-story building. The fact the County approved the Project before it formed a partnership with a private developer to construct the 19-story building is of no consequence to the CEQA analysis. To avoid minimizing environmental impacts by dividing a large project into several small ones, CEQA requires all reasonably foreseeable phases of a project to be analyzed together, whether or not such phases are ultimately completed. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 533; *Dusek v. Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1041-1042.) Moreover, CEQA requires disclosure of the significant environmental impacts of a proposed project (§§ 21061, 21100, subd. (b); *Laurel Heights Improvement Assn.*, at pp. 390-391), not the identity of the developer of the proposed project. "So long as the project is approved, CEQA has no

22

concern about who uses it." (*Maintain Our Desert Environment*, *supra*, 124 Cal.App.4th at p. 444.) Accordingly, even though at the time of Project approval the County had not yet identified a development partner to complete phase 2b of the Project, the County could reasonably rely on the projected revenue figures for the 19-story building in the KMA report to find the alternatives infeasible.

SOHO's related assertion at oral argument that the revenue figures in the KMA report for the Project alternatives should be disregarded, because the County could make more money simply by building more residential units while retaining the Star Building, has no merit. SOHO cited nothing in the record to support this assertion — in fact, the record refutes it. As we have previously discussed, the EIR and the KMA report considered the constraints on residential development imposed by retention of the Star Building and determined those constraints reduced the number of residential units that could be built and the corresponding sales revenue that could be generated significantly below those for the Project. Also, the County considered and rejected a suggestion similar to SOHO's during the EIR process. In response to the comment from the archaeological society's environmental review committee, the County determined that increasing the number of residential units in Build Alternative #2 by building additional units over the parking garage was not feasible. Thus, SOHO's assertion the County can preserve the Star Building and make more money simply by reconfiguring phase 2 to build more residential units has no support in the record and does not undermine the County's findings that Project alternatives were not feasible.

D.    *Adequacy of Responses to Public Comments*

Finally, the County challenges the trial court's ruling that responses to public comment letters were insufficient.  The court criticized the County's responses to comments from the historic site board (which suggested delaying demolition of the Star Building until completion of phase 1 of the Project) and from SOHO (which suggested incorporating the Star Building into a hotel) as "conclusory" and "speculative" and "provid[ing] no meaningful response."  SOHO additionally criticizes as "vague and unsupported" the County's response to the comment from the archaeological society's environmental review committee (which suggested adoption of Build Alternative #2 and building additional residential units above the parking garage).  Such criticism is unwarranted.  As we explain below, the County's responses were adequate.

A public agency must respond in writing to comments on environmental issues received during the noticed comment period.  (Guidelines, § 15088, subd. (a).)  "There must be good faith, reasoned analysis in response.  Conclusory statements unsupported by factual information will not suffice."  (Guidelines, § 15088, subd. (c).)  "Responses to comments need not be exhaustive; they need only demonstrate a 'good faith, reasoned analysis.' [Citations.]  . . .  The sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses, and where a general comment is made, a general response is sufficient.  [Citations.]  Satisfactory responses to comments may also be provided by reference to the EIR itself."  (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 378.)  The party challenging the adequacy of a response to a public comment under CEQA has the burden to show it is

24

inadequate. (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 937 (*Gilroy Citizens for Responsible Planning*).) SOHO has not met that burden here.

SOHO criticizes as "speculative" and "inadequate as to every point" the County's response to the historic site board's suggestion the project alternatives should include leaving the Star Building in place until completion of phase 1. SOHO cites no authority in support of its criticism, and we think it is unjustified. "CEQA does not require that an agency consider specific alternatives that are proposed by members of the public or other outside agencies." (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 420 (*City of Maywood*).) Rather, "the discussion of alternatives shall focus on alternatives to the project . . . *which are capable of avoiding or substantially lessening any significant* [*environmental*] *effects of the project*." (Guidelines, § 15126.6, subd. (b), italics added.) Merely postponing the demolition of the Star Building until the parking structure is built would not avoid or substantially lessen the adverse impact to historical resources caused by the ultimate demolition. Moreover, "CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects." (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1083.) In its response, the County referenced the EIR and supporting analyses in pointing out the economic and technological factors that made postponing the demolition of the Star Building infeasible. (See pt. I.C., *ante*.) We thus conclude the response contained the "good faith, reasoned analysis" required by CEQA (Guidelines, § 15088, subds. (a), (c)) and "adequately serve[d] the disclosure purpose

25

which is central to the EIR process" (*Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 686).

SOHO also disparages as "vague and unsupported" the County's response to the comment from the environmental review committee of the County's archaeological society, which proposed modifying Build Alternative #2 by constructing additional residential units above the parking garage. SOHO, however, did not separately discuss in its briefing the response to this comment and therefore has not met its burden on appeal to show the inadequacy of the response. (*Gilroy Citizens for Responsible Planning*, *supra*, 140 Cal.App.4th at p. 937.) In any event, the County's response was adequate. The alternative proposed in the comment was merely a variation of Build Alternative #2, which was already fully analyzed in the EIR. An agency need not separately analyze in detail a variation of project alternatives discussed in an EIR where, as here, the variation "could have been 'intelligently considered' by studying the specifics and financial feasibility of the alternatives that were discussed." (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 356 (*Cherry Valley Pass Acres & Neighbors*); see *Preservation Action Council*, *supra*, 141 Cal.App.4th at p. 1359 [when agency "already analyzed a range of alternatives directed at the same goal," it need not analyze a proposed alternative that "did not appear to be substantially different or potentially feasible"]; *Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1664 (*Marin Mun. Water Dist.*) ["EIR need not consider in detail every conceivable variation of the alternatives stated"].) The analysis of Build Alternative #2 in the EIR and the County's response explaining the timing, structural, and financial

problems associated with the variation proposed in the comment together provided the "good faith, reasoned analysis" required by CEQA. (Guidelines, § 15088, subd. (c).)

Finally, SOHO complains the response to its comment letter was "inadequate" because its suggested alternative of "a hotel may provide a way to save the historic Star Building for the long-term benefit of San Diego." We disagree. "An agency need not devote itself to an extended discussion of the environmental impact of alternatives remote from reality such as those which are of speculative feasibility or could only be implemented after significant changes in governmental policy or legislation." (*Residents Ad Hoc Stadium Com. v. Board of Trustees* (1979) 89 Cal.App.3d 274, 287.) SOHO's hotel proposal was remote and speculative by its own terms: "SOHO *believes* that a hotel *may potentially* generate more income for the County than would the currently-proposed buildings in the EIR's two non-demolition alternatives." (Italics added.) SOHO cites nothing in the record indicating there was a demand for a hotel in the area, any private entity was interested in operating a hotel on the Project site, or such operation would be profitable. An agency is not required to respond in detail to a proposed alternative in a comment unsupported by any "analysis or evidence demonstrating the feasibility of such a proposal." (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 422.) Furthermore, as the County stated in its response, the existing zoning would not allow a hotel at the site. Although applicable zoning restrictions are not necessarily dispositive, they may be considered in evaluating the feasibility of a project alternative. (Guidelines, § 15126.6, subd. (f)(1); *Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 573.) Finally, SOHO's suggested incorporation of the Star Building into a hotel is

27

similar to Build Alternative #1, which incorporated the Star Building into a residential low-rise, and would present the same structural and economic constraints that made Build Alternative #1 infeasible. Just as the County was not required to analyze separately and in detail the comment proposing a variation of Build Alternative #2, the County did not have to do so in response to SOHO's proposed variation of Build Alternative #1. (*Cherry Valley Pass Acres & Neighbors*, *supra*, 190 Cal.App.4th at p. 356; *Preservation Action Council*, *supra*, 141 Cal.App.4th at p. 1359; *Marin Mun. Water Dist.*, *supra*, 235 Cal.App.3d at p. 1664.) We thus reject SOHO's contention the County's response to the hotel proposal was inadequate under CEQA.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to enter a new judgment denying SOHO's petition for writ of mandate. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


IRION, J.

WE CONCUR:


McDONALD, Acting P. J.


O'ROURKE, J.

28